JS-6

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| GRASSHOPPER HOUSE, LLC | Case No.: 2:18-cv-00923-SVW-RAO |
|---|---|
| Plaintiff, | **FINDINGS OF FACT, CONCLUSIONS OF LAW, AND JUDGMENT** |
| vs. | |
| CLEAN & SOBER MEDIA LLC, ET AL., | |
| Defendants. | |
| CLIFFSIDE MALIBU, ET AL. | |
| Counterclaim Plaintiffs, | |
| vs. | |
| GRASSHOPPER HOUSE, LLC, ET AL., | |
| Counterclaim Defendants. | |

## I.    Introduction

On February 19, 2019, the Court held a jury trial in this action, in which the jury rendered a verdict finding in favor of Plaintiff Grasshopper House, LLC on its claims under the Lanham Act, 15 U.S.C. § 1125(a). The jury also found in favor of Counterclaim Defendants Grasshopper House, LLC, Passages Silver Strand, LLC, Chris Prentiss, and Pax Prentiss (collectively or

individually, "Passages") on the Lanham Act counterclaim advanced by Defendants and/or Counterclaim Plaintiffs Cliffside Malibu, Clean & Sober Media LLC, Richard Taite, Sunset Malibu, Cliffside Malibu II, Cliffside Malibu Outpatient Services, Cliffside Malibu 3, and Recovery Malibu (collectively or individually, "Cliffside") regarding Passages' advertisements representing the existence of a "cure" for addiction. *See* Dkt. 352.

Following the jury trial, the Court held a bench trial on February 26, 2019 to determine issues of equitable relief, including injunctive relief and equitable monetary relief. In advance of the bench trial, the parties submitted trial declarations containing their witnesses' direct testimony, as required by the Court's Standing Order for non-jury trials. During the bench trial, the Court heard evidence and testimony from the parties and witnesses, and in lieu of hearing oral closing arguments from the parties, the Court requested that the parties submit trial briefs addressing the legal issues for the Court to resolve as part of the bench trial.

Having carefully reviewed and considered the evidence presented at the bench trial and the parties' trial briefs, the Court issues the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a) regarding outstanding equitable issues.

## II.     Findings of Fact

For all findings of fact set forth below, in making any credibility determinations regarding witness testimony, the Court has considered, among other things, the manner in which the witnesses testified, their interest in the outcome of the case, and the reasonableness of their testimony in light of all of the evidence. The Court has also considered the relevant factors in Section 1.14 of the Manual of Model Civil Jury Instructions for the District Courts of the Ninth Circuit (2017 Edition), located at http://www3.ce9.uscourts.gov/jury-instructions/sites/default/files/WPD/Civil_Instructions_2018_9_0.pdf.

### A.     Cliffside's Acquisition of The Fix

In October 2013, Richard Taite, the former CEO of Cliffside Malibu, created the entity Clean & Sober Media LLC ("C&S Media"), which purchased The Fix at a bankruptcy auction.

2/20 AM Tr. at 12-13, 15.[1] The slogan for The Fix, appearing just below the title of the website, was "addiction and recovery, straight up." *See, e.g.*, Trial Ex. 2452.[2] Following acquisition by C&S Media, The Fix published two separate statements on its website to describe the process for writing reviews of treatment centers and to provide the overarching goals of The Fix's website.

The first statement, which the Court will refer to as the "Mission Statement," was published on November 17, 2013 and stated the following:

> *The Fix* is the world's leading website about addiction and recovery, featuring a daily mix of breaking news, exclusive interviews, investigative reports, essays and blogs on sober living, lifestyle and cultural resources, as well as knowledge and wisdom from expert counsel. We also offer rigorously reported Rehab Reviews, with input from thousands of alumni, plus extensive directories and practical guides for dealing with addiction and related mental health and life issues. Further, *The Fix* provides an extensive forum for debating relevant issues, allowing a large community the opportunity to express its experiences and opinions on all matters pertinent to addiction and recovery without bias or control from *The Fix*. Our stated editorial mission – and sole bias – is to destigmatize all forms of addiction and mental health matters, support recovery, and assist toward humane policies and resources.

Trial Ex. 1874. The second statement, hereafter referred to as the "Process Statement," was published on October 1, 2014 and proclaimed:

> To create our reviews, we invite selected centers to solicit former clients to complete a detailed, 20-question survey. The Fix requires at least five completed surveys before a review is generated. The surveys include questions about accommodations, meals, residents, staff, activities, and more. Alumni respond anonymously and confidentially, and reviews are written based on their responses and follow-up questions where applicable.

Trial Ex. 214.

Jay Levin, the editor-in-chief of The Fix at the time these statements were published, developed the Process Statement and the Mission Statement in collaboration with the editorial staff at The Fix, including Allison McCabe, but without any input from Taite or anyone from Cliffside. *See* 2/26 AM Tr. at 57-59; 2/19 PM Tr. at 107.

---

[1]	Throughout this Order, the Court will cite to the respective trial transcripts lodged in this case by referring to the date and time of the respective trial session from which the transcript was produced, in the format seen here.
[2]	For simplicity, the Court will refer to all exhibits lodged by the parties as "Trial Ex. ##" even though the vast majority of the relevant trial exhibits have been lodged on the docket by way of declaration.

3

### B.     The Passages Review

At the time C&S Media acquired The Fix, there was a pre-existing review of Passages Malibu, an addiction treatment center owned by Passages, written by the previous editorial staff of The Fix in 2011. *See* Trial Exs. 2451, 2452. The review page for the Passages Malibu facility included the tag line "THE REHAB REVIEW: The Inside Scoop From Hundreds of Former Clients." Trial Exs. 2451, 2452. The Passages review included alleged quotes from former clients of Passages' treatment, describing the sources of the quotes as an "alum," "former resident," or "former client." Trial Ex. 2451. The review rated Passages 5 out of 5 stars for accommodations and food, but 1 out of 5 stars for treatment, culminating in an overall rating of 1 out of 5 stars. *Id.* By June 4, 2011, Passages' overall star rating had been increased to 2 stars. Trial Ex. 2452.

The Fix continued to maintain the Passages review on its website after being acquired by C&S Media. Around September 2014, The Fix introduced a new rating system for its Rehab Reviews that allowed for more precise half-star ratings, so The Fix made adjustments to the ratings of many of the treatment centers. *See* Trial Ex. 1764. By December 2014, Passages Malibu's overall star rating had increased from 2 to 2.5 stars. *See* Trial Exs. 1033, 2454. After a reformatting of The Fix's website, The Fix also began to display banner ads for Cliffside Malibu at the top of the Passages review page and displayed links to the corresponding Rehab Review page for Cliffside Malibu. *See* Trial Exs. 2454, 2455.

Pax Prentiss, the CEO of Passages, stated that a search for "Passages Malibu" on Google would display a link to The Fix's review of Passages just below the link to the Passages website on the first page of the search results. Dkt. 371 ¶ 11. Internal Cliffside emails revealed that Cliffside urged prospective clients to read the Passages review before making a decision as to whether to enroll with Passages or Cliffside, and some of these clients made the decision to sign up with Cliffside Malibu after reading the Passages review. *See* Trial Exs. 301, 306, 406. In one email responding to an inquiry from a prospective client seeking addiction treatment, Taite gave the following suggestion: "I would do my due diligence and simply type in passages Malibu reviews into your Google bar and do the same with us and see how others view us both so that

you are comfortable." Trial Ex. 305. Cliffside characterized other clients it received as "stolen" from Passages, including one who had believed she was calling Passages Malibu but instead had called the number for Cliffside Malibu. *See* Trial Ex. 407.

### C. Cliffside's Concealment of Ownership of The Fix

Although Taite acquired The Fix through C&S Media, Taite did not want to publicize the connection between The Fix and Cliffside.

Emails from November 2013 between Jay Levin, the editor-in-chief of The Fix at the time of the acquisition by C&S Media, and McCabe, in her previous role as an editor of The Fix, reveal that The Fix had full knowledge that Taite's wife, Delphene Robertson, was the official owner and CEO of C&S Media. Trial Ex. 288. Levin acknowledged that Taite "does not want to be publicly associated with The Fix and there are good business reasons for this," and Levin requested that McCabe, who had a pre-existing personal relationship with Taite, be "discrete" in what information McCabe shares about Taite with the editorial staff. *Id.* In February 2014, in order to keep Taite's ownership of The Fix through Robertson and C&S Media confidential, Levin instructed an editor at The Fix to respond to an inquiry from a different addiction treatment center about the owner of The Fix by saying that The Fix "is owned by a private individual who does not own a treatment center." Ex. 290. By 2016, Taite became the sole owner of C&S Media by acquiring the company from Robertson. *See* 2/20 AM Tr. at 13.

Levin, who had been hired by Taite as the editor-in-chief of The Fix shortly after the acquisition by C&S Media, sent an email to Taite on June 18, 2014, in which Levin decided to "step aside from wearing the ad director's hat." Trial Ex. 294. Levin cited frustration with Taite for Taite's "intention to manipulate the reviews" of addiction rehab centers on The Fix and Taite's efforts to "pick and choose who can advertise" on The Fix. *Id.* Levin warned Taite that "[o]nce public and known through the industry, the likelihood is it would permanently crash ad sales and may even invite FTC investigation and lawsuits." *Id.* McCabe, who replaced Levin as the second editor-in-chief of The Fix, was a longtime friend of Robertson and previously had been the editor for Taite's book. 2/19 PM Tr. at 36-38.

An email exchange between Taite and McCabe in March 2017 revealed Taite's efforts to keep Cliffside's ownership of The Fix secret from the other editors at The Fix. McCabe represented that "my writers and staff are not aware of a connection between The Fix and [Cliffside Malibu]," and Taite responded by saying that "I don't want these guys [at The Fix] knowing anything" about the connection between The Fix and Cliffside. Trial Ex. 900. In that email exchange, Taite also instructed McCabe to remove an entire paragraph of an article The Fix had written regarding Cliffside Malibu, asking McCabe to "please stop giving other rehabs credit" for Cliffside's work. *Id.* McCabe complied with Taite's request and removed the paragraph from the article. *Id.*

Other actions taken by Taite confirm the close relationship between Taite, Cliffside Malibu, and The Fix. By February 10, 2014, only a few months after C&S Media acquired The Fix, Taite manually changed the overall star rating for Cliffside Malibu from 4 to 5 stars, without conducting any additional surveys of former Cliffside clients. *See* Trial Exs. 215, 216. McCabe testified that Taite "on his own called somebody" at The Fix and "told them to bump [Cliffside Malibu's overall rating] up to five stars without me or Jay Levin or anyone knowing." 2/19 PM Tr. at 88. In April 2014, Taite also sent an email to The Fix demanding that The Fix change the order of treatment centers as listed in the directory on The Fix for centers in Malibu, specifically requesting that the centers be listed in the following order: "Cliffside, visions, visions, sunset, creative care, Canyon, Canyon, Malibu Horizon , journey, paradigm, Soba, promises, passages." Trial Ex. 291. In the same email, Taite conveyed his frustration that "I ask for something simple to be done [on The Fix] and I get blown off and treated like a redheaded stepchild." *Id.* In January 2015, Taite also organized a re-review of Genesis, one of Cliffside's treatment centers, and told McCabe to write the new review based on former client surveys "without my input, so that if anybody ever asks you, you can tell them the truth, that it was done like any other review." Trial Ex. 225.

In an email from July 2017 Taite conveyed to an employee of Cliffside Malibu of the belief that Cliffside's competitors "are trained to simply talk shit about Cliffside and why Cliffside is a piece of shit why they are better," and Taite admitted that "I know this to be true,

because before I had a commercial, I did the same thing, to promises and passages, that's how I filled Cliffside!" Trial Ex. 952. At trail, Taite confirmed that, before Cliffside began to run television advertisements, Cliffside would purchase online advertisements for key words associated with Cliffside's competitors: "We would buy the name from promises. Passages would run commercials we would buy the name for Passages. That is just what you did back then and now, they're doing it to us." 2/20 AM Tr. at 36-37.

At her deposition, McCabe admitted that The Fix intentionally did not disclose its affiliation with Cliffside because "if people knew [The Fix] was associated with the rehab [Cliffside Malibu], they might question our articles. So I wasn't going to like throw up a beacon." 2/19 PM Tr. at 44. McCabe testified at trial that she believed that Taite's relationship with The Fix did not affect The Fix's operations and did not make The Fix biased. *Id.* at 41. McCabe testified that she did not even consider The Fix to be affiliated with Cliffside and that the editorial staff had always been separate. McCabe similarly stated that she believed Taite "was never involved in anything" that happened at The Fix. *Id.* The Court finds that McCabe's testimony about Taite's involvement with The Fix is not credible and is refuted by the documentary evidence showing Taite's direct involvement in the content of the rehab reviews on multiple occasions.

### D. Passages' Attempts to Remove the Review

Passages was aware of The Fix's review of the Passages Malibu facility and wanted the review to be taken down. Pax Prentiss testified that he believed the Passages review was false or "highly inaccurate" when it was first posted in 2011. 2/19 AM Tr. at 57, 84.

Passages contacted The Fix's editorial team on several occasions to request that The Fix remove the Passages review from its website, but The Fix denied all of Passages' requests. For example, on July 16, 2014, The Fix emailed Passages, stating: "In response to your last email about taking your review down, I was told all reviews will remain active." Trial Ex. 201. The Fix additionally noted that the Passages review ranks highly on Google and receives significant traffic, and The Fix implicitly invited Passages to agree to a new review of Passages Malibu, advising that "your new review with us would only go up in rating." *Id.* The Fix also informed

Passages of the traffic and exposure that the Passages review had received, and, in fact, three of the top 20 key word searches used in connection with The Fix were related to Passages. *See* Trial Exs. 111, 201.

During the time that Passages repeatedly asked The Fix to take down the Passages review, McCabe, then the editor-in-chief of The Fix, attempted to locate any of the surveys that may have been completed in connection with the initial Passages review published in 2011. *See* 2/19 PM Tr. at 70-73. On March 6, 2015, McCabe emailed May Wilkerson, a former employee of The Fix, to ask whether Wilkerson had any information about where the information in the Passages review came from. Trial Ex. 1696. Wilkerson responded that she did not have any such information and referred McCabe to Hunter Slaton, the former editor of the Rehab Reviews section of The Fix at the time the Passages review was written. *Id.*

The following day, McCabe emailed Anna David, a longtime employee of The Fix at the time, to inquire if David "ha[d] any idea where the info for the rehab reviews came from before we did them on surveymonkey." Trial Ex. 230. In the email, McCabe specifically noted that "Passages, for instance, has several quotes which I can't find in the surveys submitted by their alumni." *Id.* Ultimately, McCabe was unable to find any written submissions from Passages alumni dating back to March 2011 when the Passages review was first written. 2/19 PM Tr. at 73. The only written reviews for Passages identified by McCabe were written after 2011 and did not specifically contain any of the language used in the 2011 review. *See* Trial Ex. 235; *see also* 2/19 PM Tr. at 74-76, 78 (identifying the Passages review as "one of these many reviews from 2011 for which we didn't have SurveyMonkey surveys").

On July 18, 2016, Passages sent a letter to McCabe in response to an email offering for The Fix to conduct a "re-review" of Passages Malibu that would replace the existing review and rating of Passages on The Fix. *See* Trial Ex. 699. In the letter, Passages complained that the review of Passages on The Fix did not comply with the Process Statement and demanded that The Fix remove the Passages review. *Id.* McCabe responded to Passages' letter, stating that "[u]nder prior management, the review process may have been different, but that does not mean there is anything wrong with the earlier reviews. They are all comprehensive and thorough, and

8

we believe that to be the case about the review of Passages Malibu." *See* Trial Ex. 745. At trial, McCabe elaborated that the "different" process that might have been used by previous editors, based on McCabe's conversations with those editors, was "more old-school journalism" involving talking to alumni by phone or in person and simply taking notes during the conversation. 2/19 PM Tr. at 77-78.

After its requests to remove the Passages review from The Fix were denied, Passages never agreed to submit to a re-review as McCabe had offered. *See* 2/19 AM Tr. at 65-66.

**E.      Passages' Discovery of Cliffside's Ownership of The Fix**

When Taite created C&S Media, Taite had his attorney, Loren Beck, sign C&S Media's articles of incorporation. Trial Ex. 117. Pax Prentiss testified that he had previously met Beck and knew that Beck was associated with Taite. 2/26 PM Tr. at 98-99. In September 2014, Prentiss emailed a colleague at Passages stating that Prentiss had entered a Google search for his own name and saw an advertisement for the Passages review on The Fix, but when Prentiss clicked on that link, he was directed to the review of Cliffside Malibu on The Fix instead. Trial Ex. 116. Prentiss did not take any further actions to investigate as to why this might have occurred. 2/26 PM Tr. at 101.

On November 3, 2017, an article was released on a journalistic website called The Verge, which exposed the financial connection between Cliffside and The Fix. *See* Trial Ex. 2654. Pax Prentiss testified that he did not know about Taite's ownership of The Fix until the publication of the article on The Verge. 2/19 AM Tr. at 75; 2/26 PM Tr. at 91, 107. Prentiss testified that he "never made any effort to find out who owned The Fix" prior to the publication of the article in The Verge. 2/26 PM Tr. at 100. Shortly after the article was published on The Verge, The Fix added a disclaimer to its websites noting the common ownership with Cliffside Malibu and explaining that some of the older reviews in the Rehab Review section were written by the former editorial team using different criteria. Dkt. 383-1 ¶¶ 27-28.

Passages filed the complaint in this action on February 2, 2018. *See* Dkt. 1. After litigation commenced, Taite contacted Passages and offered to remove the Passages review in exchange for a release of liability, which Passages rejected. *See* 2/26 AM Tr. at 18-20.

**F.    Evidence of Cliffside's Profits from the Passages Review on The Fix**

Between 2014 and 2018, Cliffside paid C&S Media approximately $5 million for banner advertisements for Cliffside Malibu to appear on websites throughout The Fix's domain. 2/20 AM Tr. at 7; Dkt. 361 ¶ 7; Dkt. 361-2. Taite approved all advertising expenditures and monitored their effectiveness "by feel," as opposed to relying on analytical data. *See* 2/20 AM Tr. at 15-16.

From 2014 to 2018, there were 192,434 organic visitors to the Passages review on The Fix, with the term "organic" referring to a visitor who was directed to the Passages review from Google search results, not advertisements. Trial Exs. 1326-1691 (Google analytics showing the number of visitors); Trial Ex. 2749 (spreadsheet prepared by Cliffside compiling the underlying Google analytics data); Dkt. 369 ¶ 7 (describing the meaning of "organic" visitor). The number of visitors to the Passages review page sharply increased following C&S Media's acquisition of The Fix in October 2013. *See* Trial Ex. 2749; Dkt. 402 at 7 (Passages' post-trial brief graphically summarizing the number of visitors to the Passages review page per year). Similarly, Cliffside's net income increased from approximately $400,000 per year from 2011 to 2013 to over $4 million in 2014, and again to approximately $5.5 million in 2015. *See* Trial Ex. 1125.[3]

Since October 2014, according to Google analytics, there were only 793 visitors of The Fix who viewed both the Passages review page and either the About Reviews page featuring the Process Statement or the Terms and Conditions Page. Trial Ex. 2749. After July 2014, only 462 people viewed both the Passages review and the Mission Statement on The Fix. *Id.*

---

[3]    Cliffside objects to Passages' reliance on Trial Exhibit 1125, which was admitted into, but subsequently removed from, evidence on February 20, 2019 during Phase I of trial. *See* 2/20 AM Tr. at 42-44 (the Court stating that Exhibit 1125 "is removed. And the jury is to disregard any part of it they may have seen"). Evidently, the parties never re-introduced Exhibit 1125 during Phase III of trial, the portion of the trial pertaining to disgorgement. Passages argues that the Court merely removed Exhibit 1125 from the jurors' screens but did not strike the exhibit from the record. Dkt. 429 at 2. However, Passages attached Exhibit 1125 to a declaration submitted as part of Passages' evidence to be relied upon during Phase III of trial, and Cliffside never objected to the introduction of the exhibit in that manner. *See* Dkt. 375-21 (attaching Exhibit 1125 as an exhibit to the declaration of Jason Levin, Dkt. 375-2). Following the Phase III trial, the parties agreed to admit all exhibits attached to the parties' Phase III declarations. *See* 2/26 PM Tr. at 199. Therefore, the Court finds Trial Exhibit 1125 properly admitted into the record without objection.

## G. Passages' Own Unbranded Website Campaign

Truman Hedding III formerly worked for Passages Malibu from February 2006 to August 2010 to promote Passages through pay-per-click advertising and other marketing on Google and Yahoo. Dkt. 364 ¶¶ 7-8. In connection with Hedding's responsibilities, Pax Prentiss asked Hedding to participate in a campaign to purchase domain names that can be used to publish websites advocating for Passages' services and/or establish a referral service to allow prospective clients to call Passages for treatment. *See id.* ¶¶ 18, 25; Dkts. 364-1—364-4, 364-7. Prentiss's goal with these websites was to "build, maximize, get traffic, and get CALLS from" the websites. Dkt. 364-3. Hedding admitted that he did not have personal knowledge as to Passages' unbranded website campaign after he stopped working for Passages in August 2010. 2/26 PM Tr. at 21.

Over the course of more than a decade, Passages acquired many domains for the purpose of promoting Passages' brand. *See* Trial Ex. 2006-A. Pax Prentiss received regular emails from employees at Passages describing any updates about Passages' unbranded websites, including any new postings on those websites and the amount of interest generated by those websites. *See* Trial Exs. 112-15.

Arun Thach began working for Passages in February 2016 as a search engine marketing manager. 2/26 PM Tr. at 142; Dkt. 369 ¶ 5. Part of Thach's responsibilities was to build links to websites favorable to Passages to improve Passages' position in search results on search engines such as Google. 2/26 PM Tr. at 142. In March 2016, Pax Prentiss emailed Mark Bailey, an information technology employee with Passages, stating that Cliffside is "getting all their calls from referral websites. They also use the Fix site as a way to deter clientsfrom [sic] going to Passages." Trial Ex. 123. Prentiss conveyed his intent to "overcome" Cliffside's alleged tactics and proposed that Passages "create our own referral sites, and get Fix off our back." *Id.* Bailey responded, characterizing Cliffside as utilizing The Fix to "hid[e] behind journalism and fake reviews." *Id.* Bailey proclaimed, "We'll beat them at their own game." *Id.*

Under this campaign, Passages purchased numerous domains and created content on websites that would discuss Passages favorably and provide links to Passages' website. *See* 2/26

PM Tr. at 146 (Thach admitting that all of the content on the unbranded websites was created by Passages). One of the unbranded websites Passages created was "baltimorehealth.org," a webpage purporting to be the Baltimore Health Resource Center and included a picture of the seal of the City of Baltimore. *See* Trial Ex. 2513. The website provided links to Passages under a "Resources" section at the bottom of the page and was copyrighted by "Baltimorehealth.org." *Id.* Another of Passages' unbranded websites was "denverijournal.com," which purported to be an independent newspaper and published an article entitled "Passages Malibu – Revolutionizing Addiction Treatment." Trial Ex. 1896. Passages' domain "westerncollege.com" purported to be a blog about drug and alcohol addiction and featured multiple articles about Passages Malibu. *See* Trial Ex. 2486. Other of Passages' unbranded websites included "preciouspassage.com," "healthierorganics.com," "worldwildtravel.com," "outreachworld.org," and "findinghopeinrecovery.com," each of which appeared to be independent resources for addiction treatment but displayed favorable articles about Passages specifically. *See* Trial Exs. 1898, 1916, 1939, 2504, 2551. Some of these unbranded domains provided directories of phone numbers to rehab centers and even included supposed referral services for addiction treatment, which were actually phone numbers connected to Passages. *See* Dkt. 364 ¶¶ 34, 37, 39, 43, 47; Dkts. 364-9— 364-12, 364-16, 364-17, 364-19. One of these "referral" sites, with the domain name "soberplace.com," was receiving more organic traffic than Passages' website for Passages Malibu as of October 2009. Dkt. 364 ¶ 35; 2/26 PM Tr. at 33. Another, "alcoholrehab.org," was averaging 1,000 visitors per month in July 2010. Dkts. 364-21, 364-22.

The majority of Passages' unbranded websites did not mention Cliffside at all. However, one site, "ghctotalhealth.org," featured an article entitled "Top 5 Luxury Rehab Centers in Malibu, California" and listed Passages Malibu first, Promises Malibu second, and Cliffside Malibu third. Trial Ex. 2571. The list of treatment centers was allegedly "[b]ased on reviews" but did not claim to rank the five centers from best to worst. *Id.* The lone comparison between Passages and Cliffside on this page was the assertion that Cliffside's facilities are "home-like and attractive without aspiring to the heights of interior décor you'll find at the super-smart Passages center." *Id.* The homepage for GHC Total Health contained in the margins the representation that

"[f]or California rehab centers we highly recommend Passages Malibu," linking to the Passages website. Trial Ex. 1950. Just below that sentence, the website then included a reference to The Verge article about Cliffside's affiliation with The Fix. *Id.* Additionally, the "baltimorehealth.org" domain at one point featured the article from The Verge that discussed Cliffside's affiliation with The Fix, and the article appeared on Baltimore Health with the tag "cliffside malibu." *See* Trial Ex. 157.

When purchasing these domains, Passages did not identify itself as the owner and instead registered the owner as the domain name itself, meaning that Passages' identity as the true owner of the website was not publicly disclosed. *See* Dkt. 364 ¶ 15; *see also generally* Trial Ex. 2006 (Passages' report of transactions from January 2001 to December 2016 indicating that purchases of unbranded domains were registered as the domain name). At trial, Hedding testified that, as a result of the unbranded websites with referral services that actually corresponded to Passages' phone numbers, potential clients seeking addiction treatment actually called Passages believing that they were dialing a neutral referral service. *See* 2/26 PM Tr. at 34-36; Dkts. 364-21, 364-22 (evidence that a different unbranded website created by Passages had over 1,000 visitors per month in 2010).

Thach testified that, as of February 26, 2019, Passages owns approximately 169 domains. 2/26 PM Tr. at 144. Of those domains, 86 do not have a website, 53 domains were branded under the Passages name since they were created, and 28 were unbranded websites at the time Passages filed its lawsuit. *Id.* After Cliffside filed its counterclaims against Passages, including a claim of false advertising for failing to disclose affiliation to Passages on the unbranded websites, Passages added disclaimers to their unbranded websites to disclose Passages' ownership. 2/26 PM Tr. at 144.

## III.    Conclusions of Law

In their post-trial briefs, the parties raise four equitable issues for the Court's determination following the bench trial: (1) whether laches applies to bar any of Passages' claims on timeliness grounds; (2) whether Passages is precluded from relief due to unclean hands; (3) whether and to what extent Passages is entitled to injunctive relief; and (4) whether Passages has

13

provided sufficient evidence to recover equitable monetary relief. The Court will address each of these issues in turn.

### A. Laches

#### 1. *Legal Standards*

The Lanham Act does not provide for an explicit statute of limitations period, and therefore courts "borrow" the analogous state statute of limitations period. *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 836 (9th Cir. 2002) (citations omitted). However, because it was unclear as to whether Congress intended to create a separate statute of limitations defense for Lanham Act claims, as opposed to relying merely on "principles of equity," the Ninth Circuit applies the state statute of limitations period in the context of the equitable defense of laches. *Id.* at 837. A defendant asserting a laches defense has the burden to establish that (1) the plaintiff unreasonably delayed in filing suit, and (2) the defendant suffered prejudice as a result. *Id.* at 835 (citations omitted).

As to the first element, the reasonableness of a plaintiff's delay in initiating litigation is determined with reference to the applicable state statute of limitations period. *Id.* at 836. Thus, "if a [Lanham Act] claim is filed within the analogous state limitations period, the strong presumption is that laches is inapplicable; if the claim is filed after the analogous limitations period has expired, the presumption is that laches is a bar to suit." *Id.* at 837 (citations omitted).[4]

---

[4] Cliffside argues, as it has previously done in this litigation, that the Lanham Act does authorize a separate statute of limitations defense in addition to the equitable laches defense, because Ninth Circuit precedent prior to *Jarrow Formulas* implied that such a statute of limitations defense was independently available. Dkt. 405 at 12 n. 13 (citing *Karl Storz Endoscopy v. Surgical Techs., Inc.*, 285 F.3d 848, 857 (9th Cir. 2002); *Gen. Bedding*, 947 F.2d at 1397, 1397 n. 2). The Court already rejected this argument, relying on *Jarrow Formulas*, in its Order denying Cliffside's ex parte application filed during the Phase I jury trial. *See* Dkt. 337. To elaborate here, *Jarrow Formulas* cited to the authority relied upon by Cliffside, and *Jarrow Formulas* did not merely "express[] some skepticism" about whether an independent statute of limitations defense could still be available, as Cliffside suggests. *See* Dkt. 205 at 12 n. 13. Instead, *Jarrow Formulas* affirmatively *held*, consistent with opinions in other circuits, that the statute of limitations affords a strong presumption of laches. 304 F.3d at 837 (citations omitted). The Ninth Circuit has consistently applied *Jarrow Formulas* by relying on the analogous state statute of limitations period only in the equitable context of laches, without analyzing a separate statute of limitations defense. *See, e.g.*, *Huseman v. Icicle Seafoods, Inc.*, 471 F.3d 1116, 1125 (9th Cir. 2006) (citing *Jarrow Formulas* for the notion that "[l]aches is an equitable affirmative defense available for actions that do not have a specific applicable statute of limitations"); *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 997 (9th Cir. 2006) (analyzing a laches defense based on an applicable state statute of limitations period under *Jarrow Formulas*); *Tillamook Country Smoker, Inc. v. Tillamook Cty. Creamery Ass'n*, 465 F.3d 1102, 1108 (9th Cir. 2006) (same for a claim of trademark infringement under the

Here, the Court previously held that the analogous California statute of limitations period, for claims of fraud, is three years. *See* Dkt. 51 at 5 (citing Cal. Civ. Proc. Code § 338); *see also Jarrow Formulas*, 304 F.3d at 838 (for Lanham Act false advertising claims "the analogous limitations period is California's period for fraud, which is three years").

For continuing Lanham Act violations, such as those at issue in this litigation, "the presumption of laches is triggered if any part of the claimed wrongful conduct occurred beyond the limitations period." *Jarrow Formulas*, 304 F.3d at 837. Thus, because the purpose of laches is to "penalize[] dilatory conduct," the plaintiff must "file suit promptly when the defendant *commences* the wrongful conduct." *Id.* at 837-38 (emphasis added). "To hold otherwise would 'effectively swallow the rule of laches, and render it a spineless defense.'" *Id.* at 837 (quoting *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 953 (9th Cir. 2001)).

Once the applicable state statute of limitations period is identified, the court assesses the length of the plaintiff's delay in filing suit beyond the limitations period to determine if such a delay was reasonable. *Id.* at 838. The reasonableness of the delay is assessed in reference to the length of time afforded to the plaintiff under the state limitations period, as well as "whether the plaintiff has proffered a legitimate excuse for its delay." *Id.* (citation omitted).

Under federal law, "the limitations period runs from the time the plaintiff knew or should have known about his [Lanham Act] cause of action." *Id.* at 838 (citing *Gen. Bedding Corp. v. Echevarria*, 947 F.2d 1395, 1397 n. 2 (9th Cir. 1991)). Cliffside argues that the Court should instead apply the "delayed discovery" rule under Cal. Civ. Proc. Code § 338(4), relied upon in *General Bedding*, to determine the point at which the statute of limitations period begins to run. *See* Dkt. 405 at 9; *see also id.* at 9 n. 7 (arguing that Passages has the evidentiary burden to prove

---

Lanham Act). Contrary to Cliffside's argument, to allow Cliffside to assert a separate statute of limitations defense would be a departure from the rule clearly set forth in *Jarrow Formulas*.

If there is any doubt, the Supreme Court recently addressed the interplay between a statute of limitations period and a laches defense, explaining that "[w]hen Congress enacts a statute of limitations, it speaks directly to the issue of timeliness and provides a rule for determining whether a claim is timely enough to permit relief." *SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, ⸺ U.S. ⸺, 137 S. Ct. 954, 960 (2017) (citation omitted). The Supreme Court concluded that "[l]aches is a gap-filling doctrine, and where there is a statute of limitations, there is no gap to fill." *Id.* at 961 (citations omitted). Accordingly, because the Lanham Act provides no statute of limitations period, laches is necessary to "fill the gap" to prevent untimely claims. If a separate statute of

that Passages "could not have discovered the false advertising [by Cliffside] within three years of filing suit") (citing *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 802 (2005); *O'Connor v. Boeing N. Am., Inc.*, 311 F.3d 1139, 1150 (9th Cir. 2002)). The authority upon which Cliffside relies did not address a Lanham Act claim and instead analyzed state law causes of action. As the Ninth Circuit explicitly noted, "[f]or federal claims, federal law determines when the state statute begins to run." *Gen. Bedding*, 947 F.2d at 1397 n. 2 (citing *Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1412 (9th Cir. 1987)). Nevertheless, the Ninth Circuit has repeatedly noted that the federal standards are functionally identical to California's discovery rule. *See id.* (the federal and California standards for when a statute of limitations period begins to run "are apparently identical, the period for each commencing when the plaintiff discovered or could have discovered the fraud with the exercise of reasonable diligence"); *O'Connor*, 311 F.3d at 1147 ("Under both federal and California law, the discovery rule provides that a limitations period does not commence until a plaintiff discovers, or reasonably could have discovered, his claim.") (citations omitted). Thus, the Court views California authority interpreting and applying the delayed discovery rule to be instructive, even if not directly applicable to laches under the Lanham Act.

One of the parties' central disagreements regarding laches is how much information a plaintiff must "know" about the existence of a Lanham Act cause of action to trigger the statute of limitations period. The majority of federal law to address the question implies that the limitations period begins even if the plaintiff does not have knowledge of every element of the federal cause of action; it is enough for the plaintiff to know about the general "essence" of its claim. *See, e.g.*, *Internet Specialties W., Inc. v. Milon-DiGiorgio Enters., Inc.*, 559 F.3d 985, 990 (9th Cir. 2009) (concluding that the "essence" or "central element" of a trademark infringement claim under the Lanham Act is the likelihood of confusion between marks and analyzing the point in time at which the plaintiff knew or should have known about the likelihood of confusion) (citations omitted); *see also United States v. Kubrick*, 444 U.S. 111, 123 (1979)

limitations defense was available, as Cliffside argues, then the entire laches doctrine developed by *Jarrow Formulas* would necessarily no longer be good law, a result which is obviously incorrect.

1  (rejecting the argument that a plaintiff bringing an action under the Federal Tort Claims Act must

2  have knowledge that his injury was the result of negligence for the statute of limitations period to

3  begin to run). This approach comports with the delayed discovery rule under California law,

4  which starts the clock when a plaintiff has knowledge or suspicion of "the 'generic' elements of

5  wrongdoing, causation, and harm" in connection with the plaintiff's cause of action. *Fox v.*

6  *Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 807 (2005) (citation omitted). The Court agrees

7  with such a general approach when determining the initiation of the limitations period, as it

8  would defeat the purpose of the limitations statute to allow a plaintiff with full knowledge of

9  another's improper conduct that has harmed the plaintiff to postpone filing a lawsuit until every

10  individualized element of the cause of action is provable with a degree of certainty.

11  If the plaintiff's delay in filing suit was unreasonable, the court turns to the second

12  element of laches, whether the defendant has suffered prejudice from the unreasonable delay.

13  *Jarrow Formulas*, 304 F.3d at 839. Prejudice has been referred to as the "most important aspect"

14  of the laches doctrine. *Huseman*, 471 F.3d at 1126-27 (citation omitted). In a copyright case, the

15  Ninth Circuit identified two primary forms of prejudice resulting from laches: "evidentiary"

16  prejudice, including "lost, stale, or degraded evidence, or witnesses whose memories have faded

17  or who have died," *Danjaq*, 263 F.3d at 955 (citations omitted); and "expectations-based"

18  prejudice, meaning that the defendant "took actions or suffered consequences that it would not

19  have, had the plaintiff brought suit promptly," *id.* (citations omitted). *See also Seller Agency*

20  *Council, Inc. v Kennedy Ctr. for Real Estate Educ., Inc.*, 621 F.3d 981, 989 (9th Cir. 2010) (a

21  finding of prejudice "requires at least some reliance on the absence of a lawsuit") (citations

22  omitted).

23  Lastly, even if both elements of laches are satisfied, "laches will not apply if the public

24  has a strong interest in having the suit proceed." *Jarrow Formulas*, 304 F.3d at 840.

25  Furthermore, "[a] party with unclean hands may not assert laches," with unclean hands referring

26  not to a willful or knowing violation of the Lanham Act but a "fraudulent intent in making the

27  challenged [advertising] claims." *Id.* at 841-42 (citations omitted).

28

2.     *Analysis*

With the above standards in mind, the Court will analyze each of Cliffside's three

Lanham Act violations to determine whether laches applies to bar Passages' claim.

i.     *Whether the Passages Review Was Based on Alumni Surveys*

During Phase I of trial before the jury regarding the parties' liability under the Lanham

Act, in response to Cliffside's ex parte application for reconsideration, the Court held that, under

*Jarrow Formulas*, "laches does not bar Passages' claim of false advertising regarding The Fix's

review of Passages." Dkt. 337 at 1. The Court found that the earliest date that Passages knew or

should have suspected that the review of Passages published in 2011 was not based on alumni

surveys was the date Passages received an email from McCabe in July 2016, which suggested

that the prior editors of The Fix did not adhere to the same survey review process articulated in

the Process Statement on The Fix. *See id.*; Trial Ex. 745.

No evidence presented during trial alters the Court's prior conclusion. Cliffside argues

that Prentiss testified at trial that he knew almost every statement in The Fix's review of

Passages' facility was false when he saw the review after it was first posted in 2011. *See* 2/19

AM Tr. at 57. However, Cliffside conflates knowledge about the *contents* of the review, which is

not at issue in this litigation, with knowledge about the *factual underpinning* for the review.

Prentiss's testimony pertained to his belief that the substantive statements in the Passages review

about the quality of the Passages facility and its associated addiction treatment were false.

Prentiss did not testify that he knew at the time the review was posted whether The Fix had

actually interviewed any alumni of Passages in preparing the review; Prentiss only had a

suspicion that the review might not have been prepared from surveys of Passages alumni

following the July 2016 email from McCabe.

More fundamentally, even if the Court accepted Cliffside's argument, Passages did not

have actual or constructive knowledge that Cliffside owned The Fix until the 2017 article

published by The Verge. This fact is significant to the question of when Passages suspected The

Fix had engaged in "wrongdoing." A Lanham Act cause of action accrues only in connection

with false or misleading statements of fact "in commercial advertising or promotion." 15

U.S.C. § 1125(a)(1)(B). The significance of the medium in which the false or misleading statement is disseminated is a crucial component of whether the statement itself constitutes "wrongdoing" in the abstract or merely amounts to an entity's exercise of its constitutional right to free speech. For instance, if The Fix maintained its status as an independent journal, unaffiliated with Cliffside, it is unclear to the Court how any false or misleading statements made by The Fix could ever be considered actionable "wrongdoing" under the Lanham Act. Indeed, neither party argues that such a Lanham Act cause of action could be brought against a journalistic website on the basis of "competition" with a product or service it reviews.

It may be true that Passages could have brought an action for defamation against The Fix in 2011 for any false statements in the review itself when the review was first posted, including false representations that the review was based on surveys of former Passages clients. But in analyzing when a statute of limitations period begins to run for a particular claim—here, under the Lanham Act for false advertising—the focus is not on when the plaintiff knew that the defendant generally engaged in some "wrongdoing" in the abstract. Instead, the focus is on the "wrongdoing" at the heart of the particular cause of action to which the statute of limitations period applies. *See Jarrow Formulas*, 304 F.3d at 838 (the statute of limitations period begins to run "from the time the plaintiff knew or should have known about his § 43(a) cause of action"); *Internet Specialties*, 559 F.3d at 990 (noting that the potential cause of action is trademark infringement and analyzing the point in time at which the plaintiff knew or should have known about the likelihood of confusion between trademarks, which is "[t]he essence of such a claim"). The essence of wrongdoing at the heart of a Lanham Act claim for false advertising is a false or misleading statement *in commercial advertising*. *See* 15 U.S.C. § 1125(a)(1)(B). Therefore, outside the advertising context, any false or misleading statements do not amount to any type of "wrongdoing" under the Lanham Act.

"Representations constitute commercial advertising or promotion under the Lanham Act if they are: (1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services." *Walker & Zanger, Inc. v. Paragon Indus., Inc.*, 549 F. Supp. 2d 1168, 1181-82 (N.D. Cal. 2007)

(citing *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 735 (9th Cir. 1999)). In addition, the representations "must be disseminated sufficiently to the relevant purchasing public," even though the representations "need not be made in a 'classic advertising campaign,' but may consist instead of more informal types of 'promotion.'" *Coastal Abstract Serv.*, 173 F.3d at 735 (internal quotation marks and citations omitted).

Here, it can be assumed that a review of an addiction treatment facility in an online addiction treatment journal was a sufficient dissemination to the target audience interested in pursuing addiction treatment. However, none of the other three requirements for commercial advertising would be satisfied by The Fix's publication of a review of Passages' facility as an independent journal. In fact, the legislative intent behind the Lanham Act was to prevent application of its protections to any false or misleading statements made by interested parties not engaged in any sort of competition with the company that is the subject of the representations. *See Wojnarowicz v. Am. Family Ass'n*, 745 F. Supp. 130, 141 (S.D.N.Y. 1990) (noting that the Lanham Act "has never been applied to stifle criticism of the goods or services of another by one, such as a consumer advocate, who is not engaged in marketing or promoting a competitive product or service"); *id.* at 142 (quoting the legislative history of the 1988 amendments to the Lanham Act in which Congress stated that adding the new requirement for "commercial advertising or promotion" in § 1125(a)(1)(B) would exclude from the scope of the Lanham Act any misrepresentations implicating free speech concerns, "such as a Consumer Report which reviews and may disparage the quality . . . of products" and that the amendment "should not be read in any way to limit . . . consumer or editorial comment") (internal quotation marks and citation omitted).

In *Ariix, LLC v. NutriSearch Corp.*, No. 17CV320-LAB (BGS), 2018 WL 1456928 (S.D. Cal. Mar. 23, 2018), the court addressed the question of whether a publication review of commercial products could be considered "commercial advertising or promotion" under the Lanham Act. The plaintiff, a nutritional supplement company, alleged that the defendant published a guide to nutritional products relied upon by consumers and professionals in the industry. *Id.* at *1. The plaintiff brought a Lanham Act claim against the defendant, asserting that

the defendant's "Gold Medal of Achievement" designation for supplement companies that meet certain standards was false and misleading. *Id.* The plaintiff argued that it qualified for the Gold Medal designation but that the defendant wrongfully refused to award the designation to the plaintiff on the ground the defendant was "reworking" the criteria for the designation, even though the plaintiff's rival was "grandfathered" into the designation in the interim. *Id.*

In analyzing whether the defendant's guide to nutritional products constituted "commercial advertising or promotion" under the Lanham Act, the court first held that "the Lanham Act doesn't apply to reviews of consumer products, even if they are alleged to be biased, inaccurate, or tainted by favoritism." *Id.* at *3. The court, however, qualified its holding: "This is not to say any publication calling itself a consumer product review actually is one, and does not constitute or contain advertising or promotion. Caselaw is replete with examples of people and entities *positioning themselves as reviewers who were actually engaged in some form of commercial product promotion*." *Id.* (emphasis added) (citations omitted). Thus, "if a publication that appears to be a consumer product review is in fact a consumer product review, it falls outside the scope of the Lanham Act's false advertising provision." *Id.*

Applying *Ariix* to the instant case, it is clear that Passages would not have been able to advance a Lanham Act claim against The Fix if The Fix was simply an independent journal reviewing consumer products—*i.e.*, addiction treatment facilities. However, only when Passages discovered in November 2017 that The Fix was positioning itself as an independent and unbiased reviewer, but had actually been affiliated with Cliffside since C&S Media purchased Cliffside in October 2013, did a cause of action under the Lanham Act accrue. Therefore, even if Cliffside was correct that Prentiss knew or should have known in 2011 that The Fix's review of Passages' facility was not based on surveys of Passages alumni, the date that Passages first knew of its *Lanham Act* cause of action regarding whether the Passages review was based on alumni surveys was in November 2017 with the publication of the article on The Verge. And because Passages brought the instant action a mere months after discovering the affiliation between Cliffside and

The Fix, Passages did not unreasonably delay in filing suit against Cliffside for its Lanham Act violations.[5]

Cliffside relies on *Demetriades v. Yelp, Inc.*, 228 Cal. App. 4th 294, 310 (2014), to argue that The Fix's review of addiction treatment centers, such as Passages' facility, could still be considered "commercial speech" even if The Fix was an unaffiliated, independent review journal. Therefore, Cliffside argues that Passages could have brought a Lanham Act cause of action against Cliffside even before Passages discovered the connection between Cliffside and The Fix.

*Demetriades* analyzed the plaintiff's claims analogous California causes of action for unfair competition and false advertising under California statutes analogous to the Lanham Act. *Id.* at 298. The court assessed whether the defendant's representations about a review filter software, used to ensure that webpages for restaurants and other public establishments only showed customers "the most trusted reviews," constituted commercial speech for purposes of an exception to California's anti-SLAPP law. *Id.* at 300, 307-10. The court held that the defendant's statements about its review filter technology constituted "commercial speech" because the statements were "intended to reach third parties to induce them to engage in a commercial transaction," in the form of customers patronizing the defendant's website and businesses purchasing advertising on that website. *Id.* at 310.

*Demetriades* is of limited utility in the instant case, due to the absence of a Lanham Act claim. The court did not hold that the defendant's statements about its review filter constituted

---

[5]       Because the delayed discovery rule applies here, the Court need not address Cliffside's argument that California's "single-publication" rule applies to The Fix's review of Passages' facility to render the publication date of the review as the date that the Passages review was first posted in 2011. *See* Dkt. 405 at 9-10 (citing *Oja v. U.S. Army Corps of Eng'rs*, 440 F.3d 1122, 1131-32 (9th Cir. 2006); *Roberts v. McAfee, Inc.*, 660 F.3d 1156, 1167-68 (9th Cir. 2011)). However, the Court notes that, because the star rating for Passages in the review was changed several times since the review was first posted, the date of publication could fairly be construed as the date the last such change in Passages' star rating was made, thus necessitating that the starting point of the laches analysis for the Passages review is not 2011 but rather sometime in the fall of 2014. *See* Trial Exs. 1033, 1764, 2454 (showing that The Fix updated its rating system in September 2014 to allow for more precise half-star ratings and that Passages' rating had increased by a half star by December 2014); *see also Yeager v. Bowlin*, 693 F.3d 1076, 1082 (9th Cir. 2012) (republication occurs "when [a statement] is reprinted in something that is not part of the same 'single integrated publication,'" including when a statement in a hardcover book "is repeated in a later paperback version of the book") (citations omitted). This provides yet another avenue to find that Passages did not unreasonably delay in filing suit against Cliffside for statements Cliffside made, and republished, via the Passages review.

"commercial advertising or promotion" for purposes of the Lanham Act, which involves a particular factor test as articulated above. Instead, the court only concluded that the defendant's statement was "commercial speech," which satisfies only the first factor articulated in *Coastal Abstract Service*. *See* 173 F.3d at 735. As noted above, the Court finds *Ariix* to be persuasive and directly applicable to the instant case. Moreover, at least one other federal court has rejected the argument that a journal article in a for-profit publication can constitute "commercial speech" under the Lanham Act merely because the publication itself generates income from the article through sales of the publication or advertising revenue. *See, e.g.*, *Edward Lewis Tobinick, MD v. Novella*, 848 F.3d 935, 952 (11th Cir. 2017) (rejecting the argument that a magazine or newspaper article not otherwise proposing a commercial transaction could be considered commercial speech "simply because extraneous advertisements and links for memberships may generate revenue"); *see also Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180, 1186 (9th Cir. 2001) ("A printed article meant to draw attention to the for-profit magazine in which it appears, however, does not fall outside of the protection of the First Amendment because it may help to sell copies."). The Court finds this position more persuasive and rejects the contrary arguments advanced in *Demetriades* in a distinguishable legal context.

Cliffside also argues that Passages could have discovered the connection between Cliffside and The Fix prior to the November 2017 article published by The Verge through diligent investigation. The Court rejects this argument as unsupported by the facts presented at trial. Even though Passages knew that Loren Beck was Richard Taite's lawyer, discovering that Beck was the signatory to C&S Media's articles of incorporation would not give Passages constructive knowledge that Beck was signing on behalf of Taite. Moreover, Prentiss's testimony that he clicked on an advertisement for The Fix, which brought him to a website featuring a review of Cliffside Malibu, does not provide Passages with constructive knowledge that Cliffside was somehow affiliated with The Fix. Whatever suspicions Passages may have had, the record shows that Passages could not have discovered the affiliation between The Fix and Cliffside through reasonable diligence. This is particularly true given Cliffside's efforts to conceal that affiliation, efforts of which there is ample evidence in the record. *See* Trial Exs. 288, 290, 900;

2/19 PM Tr. at 44. Thus, even if Passages could have been more diligent in its investigation, Cliffside's fraudulent intent in its efforts to conceal its affiliation with The Fix constituted clear and convincing evidence of unclean hands in reference to Cliffside's laches defense, providing a secondary basis to conclude that laches does not apply to any delay in Passages' lawsuit. *See Jarrow Formulas*, 304 F.3d at 842 (requiring that the defendant acted "with a fraudulent intent" in asserting a laches defense); *Pinkette Clothing, Inc. v. Cosmetic Warriors Ltd.*, 894 F.3d 1015, 1029 (9th Cir. 2018) (noting that unclean hands requires a showing of clear and convincing evidence of "wrongfulness, willfulness, bad faith, or gross negligence") (internal quotation marks and citation omitted).

Based on the above, the Court finds that Passages did not unreasonably delay in filing its Lanham Act claim pertaining to whether the review of Passages' facility on The Fix posted in 2011 was based on surveys of former Passages clients. Therefore, laches does not bar this claim.

ii.  *Whether the Passages Review Conformed with the Process Statement*

The Court holds that laches does not apply to Passages' second theory of liability regarding the Passages review on The Fix, which was whether the review conformed with the explicit process for reviewing addiction treatment centers outlined in the Process Statement posted on The Fix. The same analysis above regarding the date that Passages first discovered The Fix had engaged in "commercial advertising or promotion" applies equally to this theory.

On the date the Process Statement was first posted on The Fix in October 2014, Passages had no actual or constructive knowledge that The Fix was an affiliate of Cliffside. Passages did not know that The Fix was not an independent journalistic website acting merely for the purpose of educating consumers about competing services offered in the addiction treatment center, until the article about The Fix on was published on The Verge in November 2017. Thus, Passages did not have knowledge of the existence of a Lanham Act cause of action against The Fix when the Process Statement was first published in October 2014, even though Passages affirmatively knew

that the review of Passages Malibu on The Fix did not conform to the process embodied in the Process Statement.[6]

Even if the Court were to find that a strong presumption of laches applies due to Passages' unreasonable delay in failing to file its suit within three years of October 2014, the Court alternatively would hold that Cliffside has not met its burden to establish prejudice from Passages' short delay. *See Huseman*, 471 F.3d at 1126 (noting that, regardless of whether the plaintiff filed suit beyond the applicable state statute of limitations period, the defendant "still has the burden of proving prejudice from the delay"). Passages filed its lawsuit on February 2, 2018, less than 4 months after the publication of the Process Statement. Cliffside has not presented any evidence showing how such a short amount of time has led to either "evidentiary" or "expectations-based" prejudice.

Although Cliffside argues that it has suffered evidentiary prejudice due to the loss of documents pertaining to the Passages review in 2011 and the fading of witness memories since that time, those same conclusions are not warranted in reference to the short four-month delay between the theoretical expiration of the limitations period in October 2017 and Passages' suit filed in February 2018. Indeed, the crux of Passages' second argument about the illegitimacy of

---

[6]    Cliffside spends significant effort arguing that Passages' two separate theories of liability about Cliffside's Lanham Act violation with respect to the Passages review are not two separate causes of action, but different arguments for why the Process Statement was "false" under the first element of a Lanham Act cause of action, and that therefore the limitations period should be construed to run on the earliest date of publication of the false or misleading statement—the Process Statement—for both theories. *See* Dkt. 421 at 8-11. It is true that, in the First Amended Complaint, Passages only asserts one cause of action under the Lanham Act. *See* Dkt. 30 ¶¶ 36-44. However, the breadth of Passages' cause of action was intended to cover all allegedly false or misleading statements made by Cliffside, including not just the Process Statement as it pertains to the Passages review but also the Mission Statement and The Fix's purported lack of bias. It belies common sense for Cliffside to assert that *all* false or misleading statements alleged in the complaint should be time-barred if just *one* of the offending statements was made before the limitations period. Although *Jarrow Formulas* instructs that laches bars claims of "ongoing" violations of the Lanham Act if the wrongful conduct occurred beyond the limitations period, 304 F.3d at 837, that principle was plainly not intended to shield a defendant who repeatedly makes other false or misleading advertising representations on the same or similar subject within the limitations period.
         Tellingly, Cliffside does not argue that the limitations period for Passages' Lanham Act claim about The Fix's independence and lack of bias should also be construed to have started to run on the date that Passages first discovered that the Process Statement was not followed for the review of Passages' facility. Understandably so, because such an argument would be divorced from the purpose behind laches and the delayed discovery rule. And, regardless, because Passages did not know the true nature of The Fix's ownership and affiliation with Cliffside until November 2017, Cliffside's argument that the Court should treat Passages' dual theories of the falsity of the Process Statement as the same cause of action for purposes of analyzing the date that the limitations period began is inconsequential.

the Passages review is that The Fix never adhered to the process contained in the Process

Statement for the review, which necessarily includes the conducting of written surveys. To the

extent that Passages' claim rests on the premise that Cliffside never maintained written surveys

at all, it would be plainly deficient for Cliffside to attribute the absence of any such surveys to a

short delay in when Passages filed its lawsuit. The same can be said with respect to the

recollection of Cliffside's witnesses; to the extent that witnesses were unable to recall relevant

events that occurred in 2011, those same problems would exist had Passages sued in October

2017 rather than February 2018.

As to expectations-based prejudice, Cliffside argues that, had Passages filed its lawsuit

promptly against The Fix before C&S Media acquired The Fix in October 2013, "the review

could have been removed before any Defendant even became involved." Dkt. 405 at 14. First, as

analyzed above, Passages had no basis to bring a Lanham Act cause of action until discovering

The Fix's affiliation with Cliffside in November 2017, so Cliffside is incorrect that Passage

could have asserted its rights under the Lanham Act prior to C&S Media's acquisition of The

Fix. Second, even if Passages could have sued The Fix for a Lanham Act violation prior to

October 2013, it is unclear how *Cliffside* would be prejudiced by Passages' delay. To the extent

that Cliffside is arguing that it would not have purchased The Fix had it known of a pending

lawsuit by Passages regarding the Passages review, there is no evidence in the record to support

such a claim. And, regardless, after October 2013, The Fix repeatedly failed to take down the

Passages review after Passages requested that it do so on numerous occasions. See Trial Exs.

201, 745. In fact, Cliffside failed to remove the offending review after being sued by Passages in

February 2018, only doing so after the jury rendered its verdict in this action. Thus, Cliffside has

not provided any factual support for the conclusion that Cliffside "took actions or suffered

consequences that it would not have, had the plaintiff brought suit promptly." *Danjaq*, 263 F.3d

at 955 (citations omitted); *see also Synoptek, LLC v. Synaptek Corp.*, No. SACV 16-01838-

CJC(JCGx), 2018 WL 3359017, at *8-9 (C.D. Cal. June 4, 2018) (finding that the defendant did

not demonstrate prejudice resulting from the plaintiff's four-month delay in filing suit through

advertising expenditures of only around $50,000 to promote an infringing mark).

Accordingly, because Passages' lawsuit was not filed with unreasonable delay, and because Cliffside has not met its burden to show that it was prejudiced by any delay even if such a delay existed, laches does not apply to bar Passages' claim regarding Cliffside's false representations that it adhered to the strict process set forth in the Process Statement in connection with the Passages review on The Fix.

           iii.     *Whether The Fix Falsely Represented to Be an Independent and Unbiased Website*

The Court holds, for the same reasons articulated above, that laches does not apply to Passages' claim that Cliffside falsely represented that The Fix was an independent and unbiased journal website. Passages did not discover the falsity of Cliffside's representations until the article published by The Verge in November 2017, and Passages could not have discovered the truth of Cliffside's affiliation with The Fix through reasonable diligence prior to that date on account of Cliffside's active concealment of its affiliation with The Fix. Therefore, Passages did not unreasonably delay in suing Cliffside under the Lanham Act for falsely representing in the Mission Statement that The Fix is an independent and unbiased journal website. And, as with Passages' claim about Cliffside failing to adhere to the strict process set forth in the Process Statement, Cliffside has failed to show, assuming the limitations period began to run when the Mission Statement was posted in October 2014, that Cliffside was prejudiced by the short delay between the expiration of the limitations period in October 2017 and the filing of the instant lawsuit in February 2018.

To address one additional argument, Cliffside points out that Passages admitted at trial to believing prior to November 2017 that The Fix was biased against Passages and that The Fix was conspiring with some unknown party to disparage Passages. Therefore, Cliffside argues that Passages was required to sue The Fix once it had such a suspicion, because "[w]here the identity of at least one defendant is known . . . the plaintiff must avail himself of the opportunity to file a timely complaint naming Doe defendants and take discovery." Dkt. 405 at 11-12 (internal quotation marks omitted) (quoting *Bernson v. Browning-Ferris Indus.*, 7 Cal. 4th 926, 937 (1994)). As an initial matter, it is unclear how *Bernson* would apply to Passages' Lanham Act

claims, and Cliffside has not identified any cases where a court did so. Furthermore, as thoroughly analyzed above, Passages did not know of the existence of any proper Lanham Act defendant until becoming aware of The Fix's affiliation with Cliffside in November 2017. Had Passages hastily sued The Fix under the Lanham Act and named many Doe defendants in the hopes of identifying The Fix's "co-conspirator" through discovery, a federal court rightfully would have dismissed Passages' case on a motion under Rule 12(b)(6), because The Fix would not be a proper defendant to a Lanham Act cause of action as merely an independent journal not engaging in commercial advertising or promotion. It is immaterial that Passages had suspicions of cooperation between The Fix and another entity, because Passages could not have reasonably discovered the true owner of The Fix through diligent investigation on account of Cliffside's concealment of the relationship. Therefore, Cliffside's argument is incorrect.

Accordingly, laches does not bar Passages' third theory of Cliffside's liability under the Lanham Act predicated upon The Fix's false representations of independency and lack of bias as memorialized in the Mission Statement.

### 3.    *Summary*

To summarize the above, the Court holds that laches does not bar any of Passages' claims against Cliffside in this action. Passages did not unreasonably delay in filing suit, and Cliffside has not shown that it was prejudiced by any such delay if one existed.

### B.    **Unclean Hands**

### 1.    *Legal Standards*

To prevail on a defense of "unclean hands" in response to Lanham Act false advertising claim, "the defendant must demonstrate that the plaintiff's conduct is inequitable and that the conduct relates to the subject matter of its claims." *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 847 (9th Cir. 1987). A finding of "inequitable" conduct requires clear and convincing evidence that the plaintiff engaged in "wrongfulness, willfulness, bad faith, or gross negligence." *Pinkette Clothing*, 894 F.3d at 1029 (internal quotation marks and citation omitted). "Bad intent is the essence of the defense of unclean hands." *Perfumebay.com Inc. v. eBay, Inc.*, 506 F.3d 1165, 1177 (9th Cir. 2007) (internal quotation marks and citations omitted). In addition,

the defendant must show that the plaintiff's inequitable conduct caused injury to the defendant. *See Survivor Prods. LLC v. Fox Broad. Co.*, No. CV01–3234 LGB (SHX), 2001 WL 35829270, at *3 (C.D. Cal. June 12, 2001) (citations omitted). A harm to a public interest is not a sufficient injury for purposes of unclean hands, but a court may consider the public interest in the analysis. *See McCormick v. Cohn*, No. CV 90–0323 H, 1992 WL 687291, at *4 (S.D. Cal. July 31, 1992) (citations omitted).

For the plaintiff's inequitable conduct to "relate" to the subject matter at issue in the plaintiff's claims, the plaintiff must have "acted fairly and without fraud or deceit *as to the controversy in issue.*" *Fuddruckers*, 826 F.2d at 847 (emphasis in original) (internal quotation marks and citation omitted); *see also FLIR Sys., Inc. v. Sierra Media, Inc.*, 965 F. Supp. 2d 1184, 1193 (D. Or. 2013) ("In an action for false advertising, the unclean hands of the plaintiff must relate to the same type of product the defendant allegedly falsely advertised."). Thus, when applying unclean hands, "[w]hat is material is not that the plaintiff's hands are dirty, but that he dirtied them in acquiring the right he now asserts, or that the manner of dirtying renders inequitable the assertion of such rights against the defendants." *Ellenburg v. Brockway, Inc.*, 763 F.2d 1091, 1097 (9th Cir. 1985) (alteration in original) (internal quotation marks and citation omitted). "Factual similarity between the misconduct that forms the basis for an unclean hands defense and the plaintiff's allegations in the lawsuit is not sufficient." *Pom Wonderful LLC v. Welch Foods, Inc.*, 737 F. Supp. 2d 1105, 1110 (C.D. Cal. 2010) (citations omitted), *aff'd*, 468 F. App'x 688 (9th Cir. 2012). Instead, the plaintiff's misconduct must be "directly related to plaintiff's use or acquisition of the right in suit." *Id.* (internal quotation marks and citation omitted). Put another way, unclean hands exists only "where some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation." *POM Wonderful LLC v. Coca Cola Co.*, 166 F. Supp. 3d 1085, 1092 (C.D. Cal. 2016) (internal quotation marks and citation omitted).

2. *Analysis*

Cliffside argues that Passages is guilty of unclean hands because Passages engaged in a broad campaign to build a network of internet domains that could be used to generate page views

29

and new clients for Passages' addiction treatment facilities. The Court agrees and holds that there is clear and convincing evidence that Passages had unclean hands in relation to Passages' Lanham Act claim premised upon The Fix's false and misleading statements in the Mission Statement purporting to be an independent and unbiased journal.

Specifically, over many years, Passages spent significant time and resources to develop a network of domains, in order to "build, maximize, get traffic, and get CALLS" for Passages' treatment centers. *See* Dkt. 364-3. It is undisputed that these websites cited favorably to Passages' brand or Passages' facility, including by posting links to Passages' affiliated webpages, without disclosing that the websites were also owned by or affiliated with Passages. These unbranded websites included pages purporting to be a government agency, see Trial Ex. 2513, an independent newspaper, see Trial Ex. 1896, and a blog affiliated with a college, see Trial Ex. 2486, each of which linked to Passages' primary website and/or featured an article discussing Passages' addiction treatment favorably. Other of Passages' unbranded websites represented themselves as independent resources for people seeking guidance on addiction treatment, while simultaneously reviewing Passages favorably as a beneficial treatment option. *See* Trial Exs. 1898, 1916, 1939, 2504, 2551. Some of these unbranded domains provided phone numbers to supposed referral services for addiction treatment, which were actually phone numbers connected to Passages. *See* Dkt. 364 ¶¶ 34, 37, 39, 43, 47; Dkts. 364-9—364-12, 364-16, 364-17, 364-19. Passages even registered these domains as the domain name itself, rather than any Passages-related brand, which prevented any member of the public from adducing any affiliation with Passages based on the domain registration alone. *See* Dkt. 364 ¶ 15; *see also* Trial Ex. 2006.

These unbranded websites establish that, as Cliffside did through The Fix, Passages created purportedly independent and unbiased websites that advocated on behalf of Passages' addiction treatment facilities. Passages' conduct relates directly to the subject of its claim against Cliffside predicated on the Mission Statement—indeed, Passages' conduct is essentially the same as Cliffside's in this respect. *See, e.g.*, *Emco, Inc. v. Obst*, No. CV03–6432–R (RZX), 2004 WL 1737355, at *5 (C.D. Cal. May 7, 2004) (finding unclean hands as a matter of law because

although the defendant allegedly "has misled its customers as to the geographic origin of its . . . goods," the defendant "has shown that [the plaintiff] has misled its [own] customers as to geographic origin" which is "directly related to the subject matter of [the plaintiff's] claims"). And the evidence at trial revealed that Passages' unbranded websites, in part, caused consumer deception; at one point, one of Passages' unbranded websites even had more traffic than Passages' primary website, passagesmalibu.com. 2/26 PM Tr. at 33; *see also id.* at 34-36 (Hedding testifying about Passages' unbranded "referral" service websites and customers actually calling Passages believing they were dialing a neutral referral service); Dkts. 364-21, 364-22 (evidence that a different unbranded website created by Passages had over 1,000 visitors per month in 2010).[7] This evidence is sufficient to establish some injury to Cliffside, without the need to quantify the extent of that injury.

Furthermore, the evidence confirms that Passages willfully intended for its websites to accomplish the same thing as what Passages correctly perceived The Fix to be—a purportedly independent website providing addiction treatment resources that was actually owned and operated by a competitor in the addiction treatment industry. *See* Dkts. 364-1—364-4, 364-7; Trial Ex. 123. By responding to The Fix's alleged improper conduct with the same or substantially similar conduct, Passages demonstrated bad intent. *See FLIR Sys.*, 965 F. Supp. 2d at 1196 (noting that "[p]erhaps most importantly [for unclean hands], [the plaintiff]'s advertisement was in response to the advantage [the plaintiff] perceived [the defendant] to have in ruggedness, and which it expected [the defendant] to try and capitalize on"). The fact that Passages added disclaimers to its unbranded websites disclosing their affiliation with Passages after Cliffside filed its counterclaims, see 2/26 PM Tr. at 144, does not overcome the evidence revealing the reason Passages created the unbranded websites in the first place.

---

[7]    Cliffside argues that Passages wrongfully withheld or concealed some of the evidence offered by Truman Hedding during the discovery process. *See* Dkt. 421 at 7-8. The Court sees no reason to address Cliffside's argument, because the evidence offered by Cliffside at trial is sufficient to establish Passages' "bad intent" in conducting its unbranded domain campaign to counter the effects of The Fix.

Accordingly, based on this clear and convincing evidence, the Court holds that Passages had unclean hands as to the aspect of Passages' Lanham Act claim pertaining to The Fix's purported lack of bias as embodied in the Mission Statement.

However, the Court holds that unclean hands does not apply to the other two aspects of Cliffside's liability under the Lanham Act, regarding the review of Passages' facility on The Fix and the representations in the Process Statement. Cliffside has not identified any evidence showing that Passages affirmatively issued a comprehensive review of Cliffside or any other addiction treatment competitors on any of Passages' unbranded websites introduced at trial. Cliffside's only argument regarding these theories is that some of Passages' websites "presented content unfavorable to Cliffside" by ranking Passages above Cliffside in a list. There are obvious differences between Passages' unbranded websites and The Fix's review of Passages' facility.

For instance, one of Passages' unbranded websites is titled "Top 5 Luxury Rehab Centers in Malibu, California." Dkt. 422-50. The list of the top 5 centers, "[b]ased on reviews," ranks Passages Malibu first and Cliffside Malibu third. *Id.* The bare reference to "reviews," without more, is not a representation that the website conducted its own reviews in preparing the rankings list. Neither does the website set forth any process by which it made its determinations about how to choose and rank the top 5 treatment centers in Malibu. Without any concrete assertions on this website that could be construed as literally false, the full context of the website precludes a finding that the ranking of treatment facilities "based on reviews" was in any way deceptive or misleading. *See Southland Sod*, 108 F.3d at 1139-40. The other unbranded websites Cliffside relies upon, Dkt. 406-8; Dkt. 406-20, do not feature any reviews or rankings of addiction treatment facilities whatsoever and only refer to Passages or Cliffside in "resources" links or in other links posted in small font on the side or bottom of the webpage.

Although Passages certainly intended for its unbranded websites to counteract the harm inflicted on Passages' brand by the Passages review on The Fix, thereby supporting a finding of bad intent,[8] Passages did not engage in the same level of culpable conduct as Cliffside. Passages

---

[8] Passages argues that it had no bad intent in creating the unbranded websites, because those websites were intended merely to create more links to favorable websites for search engine optimization purposes. But Passages

did not create its own website and author a comprehensive review of Cliffside Malibu purportedly based on surveys of former Cliffside clients. While there are factual similarities in the parties' use of unbranded websites, Passages' conduct does not sufficiently relate to the conduct at issue in Passages' Lanham Act claims based on the factual basis for The Fix's review of Passages' facility. Moreover, even if Passages' conduct with respect to the particular websites identified by Cliffside was sufficiently related to Passages' claims, Cliffside has not provided any evidence that Cliffside was in any way harmed by these websites. As Passages notes, there is no evidence that there were even any visitors to these particular sites in question that actually mentioned the names of both Passages and Cliffside.

For these reasons, the Court holds that Cliffside has proven by clear and convincing evidence that Passages had unclean hands in reference to Passages' Lanham Act claim against Cliffside predicated on The Fix's representations in the Mission Statement that The Fix is an unbiased and independent website. However, the Court holds that unclean hands does not apply to bar Passages' Lanham Act claims against Cliffside predicated on The Fix's review of Passages' facility and the false or misleading statements contained in the Process Statement.

### C.    Injunctive Relief

The Lanham Act vests courts with the power to grant injunctions to successful plaintiffs, "according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right" protected under the Lanham Act. 15 U.S.C. § 1116(a).

#### 1.    *Availability of Injunctive Relief*

A plaintiff "need not prove injury when suing to enjoin conduct that violates" the Lanham Act. *Southland Sod*, 108 F.3d at 1145 (internal quotation marks omitted) (quoting *Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 210 (9th Cir. 1989)). However, a successful plaintiff is not automatically entitled to injunctive relief. *See Pyrodyne Corp. v.*

---

cannot deny the evidence revealing that Passages intended to use the websites to promote Passages' brand, knowingly failing to add any disclaimers that any of those websites were owned and operated by Passages. Indeed, by attempting to "beat [Cliffside] at their own game," Trial Ex. 123, Passages' willful participation in a perceived arms race of sorts is sufficient to establish that Passages acted with more than simple negligence in publishing unbranded websites.

*Pyrotronics Corp.*, 847 F.2d 1398, 1402 (9th Cir. 1988) (noting that "the grant of injunctive relief is not a ministerial act flowing as a matter of course") (citation omitted).

To be eligible for permanent injunctive relief, a plaintiff must demonstrate the following:

(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) (citations omitted).

Here, the evidence establishes that (1) Passages has been irreparably harmed by the continued publication of the negative review of Passages' facility on The Fix and The Fix's failure to disclose affiliation with Cliffside, (2) monetary damages would be inadequate to compensate Passages for the negative publicity Passages experienced resulting from The Fix's conduct, (3) Cliffside faces no hardships with respect to its failure to disclose affiliation with The Fix on The Fix's website and the passive publication of a review of a competitor's facility that violates the Lanham Act,[9] and (4) there are no identifiable public interest concerns implicated in connection with the issuance of injunctive relief against Cliffside precluding them from future violations of the Lanham Act. Therefore, Passages is entitled to permanent injunctive relief to prevent Cliffside from engaging in future violations of the Lanham Act with respect to the review of Passages' facility on The Fix and The Fix's failure to disclose its close affiliation with Cliffside.[10]

---

[9]     Cliffside vaguely argues that an injunction would be "problematic" given Cliffside's right to free speech under the First Amendment. *See* Dkt. 405 at 25. While the Court agrees that such a right is generally implicated in the journalism context, Cliffside has not adequately explained how Cliffside maintains a right under the First Amendment to continue publishing an article that violates the Lanham Act. The fact that Congress enacted the Lanham Act to protect against false or misleading advertising statements, including the court's ability to fashion equitable injunctive relief, indicates that First Amendment protections were not intended to, and do not, supersede any of the Lanham Act's prohibitions. *See U-Haul Int'l, Inc. v. Jartran, Inc.*, 793 F.2d 1034, 1042 (9th Cir. 1986) ("Nothing is clearer in the emerging law of commercial free speech than that false or misleading commercial speech is clearly 'subject to restraint.'") (citations omitted). Therefore, Cliffside would not face a "hardship" by being unable to continue publishing its illegal review of Passages' facility on The Fix.

[10]     The Ninth Circuit has previously considered the equitable defense of laches in the context of whether equitable relief is available, see *Pinkette Clothing*, 894 F.3d at 1027 (collecting cases), but no Ninth Circuit cases directly address whether unclean hands is an appropriate defense to a request for injunctive relief. Nevertheless, although the Court found above that Passages had unclean hands with respect to the aspect of Passages' Lanham Act claim pertaining to The Fix's failure to disclose affiliation with Cliffside, the Court holds that Passages' unclean hands does not overcome the equitable considerations above for when prospective injunctive relief is appropriate to

1    Cliffside argues that The Fix has already taken down the entirety of the review of

2 Passages' facility, as well as reviews of Cliffside, and that therefore there is no need for any

3 injunctive relief in this case. Dkt. 405 at 25. However, the Supreme Court has noted that the test

4 for when a claim becomes mooted by a defendant's voluntary cessation of a challenged action is

5 stringent, and mootness can only be found "if subsequent events made it absolutely clear that the

6 allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth,*

7 *Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (internal quotation marks and

8 citation omitted). This is equally true in the context of injunctive relief under the Lanham Act,

9 where the Ninth Circuit has refused to require a plaintiff to introduce specific evidence

10 demonstrating that the defendant violating the Lanham Act would continue to infringe in the

11 future. *See Polo Fashions, Inc. v. Dick Bruhn, Inc.*, 793 F.2d 1132, 1135 (9th Cir. 1986). Thus,

12 an injunction is appropriate where a Lanham Act defendant has "refused to stop violating those

13 rights [protected under the Lanham Act] until [the plaintiff] brought suit in federal district court."

14 *Id.* From a practical standpoint, "[i]f the defendants sincerely intend not to infringe, the

15 injunction harms them little; if they do, it gives [the plaintiff] substantial protection" of its

16 Lanham Act rights. *Id.* at 1135-36. Moreover, "any doubt in respect of the extent [of injunctive

17 relief] must be resolved in [the plaintiff's] favor as the innocent producer and against the

18 [defendant], which has shown by its conduct that it is not to be trusted." *Levi Strauss & Co. v.*

19 *Shilon*, 121 F.3d 1309, 1314 (9th Cir. 1997) (second and third alterations in original) (internal

20 quotation marks omitted) (quoting *William R. Warner & Co. v. Eli Lilly & Co.*, 265 U.S. 526,

21 532 (1924)).

22

23

24 protect the parties and the public from future false or misleading representations from affiliated addiction treatment review websites pretending to be independent journalistic organizations. *See, e.g.*, *FLIR Sys.*, 965 F. Supp. 2d at 1197 ("While [the plaintiff] may come with unclean hands, this does not foreclose the possibility it is entitled to injunctive relief . . . ."); *Cascade Yarns, Inc. v. Knitting Fever, Inc.*, No. C10–861 RSM, 2015 WL 1735517, at *7 (W.D. Wash. Apr. 15, 2015) (citing authority supporting the proposition that unclean hands does not bar prospective injunctive relief and noting that considerations of public interest may warrant the issuance of injunctive relief despite the movant's unclean hands; *2Die4Kourt v. Hillair Capital Mgmt., LLC*, No. SACV 16-01304 JVS(DFMx), 2016 WL 4487895, at *9 (C.D. Cal. Aug. 23, 2016) (noting that "in deciding whether plaintiff's alleged unclean hands should bar injunctive relief . . . the Court must consider the public interest" and that "courts will not withhold an injunction for unclean hands when, as here, allowing the defendant to continue using the trademark would cause consumer confusion") (internal quotation marks and citation omitted).

Here, Cliffside has presented no evidence supporting the conclusion that a future Lanham Act violation on The Fix will not happen again. In fact, as in *Polo Fashions*, Cliffside refused to remove the review of Passages' facility from The Fix's website, after years of Passages requesting that The Fix do so, until the jury rendered its verdict in favor of Passages in this litigation. The mere fact that Cliffside has now removed the offending content from The Fix does not, without more, warrant the conclusion that it is "absolutely clear" that Cliffside's Lanham Act violations with respect to The Fix could not reasonably be expected to recur at some time in the future. Injunctive relief is necessary to ensure that The Fix does not continue to violate the Lanham Act (1) by posting any reviews of Passages' facility that do not comport with The Fix's review guidelines embodied in the Process Statement, or (2) by failing to disclose The Fix's affiliation with Cliffside contrary to the Mission Statement.

2.    *Scope of Injunctive Relief*

Passages makes three particular requests for injunctive relief: (1) that the Court order Cliffside to remove the Passages Malibu review page from "all properties" owned by Cliffside, as well as from search engines, content delivery networks, archives, or other websites containing the review; (2) that the Court order Cliffside to replace the previous URL for the Passages Malibu review on The Fix with a "page not found" error message, otherwise called a "404 error"; and (3) that the Court order Cliffside not to use any "metadata key words" related to Passages' brand in connection with any websites owned by Cliffside.

First, the Court finds it reasonable and appropriate to enjoin Cliffside from continuing to publish the review of Passages' facility on The Fix. As noted above, removing the Passages Malibu review from The Fix is necessary to prevent irreparable harm to Passages and would resolve Cliffside's violation of the Lanham Act with respect to the Passages review and the Process Statement posted on The Fix. Removing this review, which itself violates the Lanham Act, does not pose any First Amendment concerns, because Cliffside has not explained why it possesses a right to free speech to disseminate content on The Fix that violates the Lanham Act. However, the Court believes that the breadth of an injunction requiring Cliffside to ensure that the review is not posted anywhere on the internet may be infeasible or outside of Cliffside's

control. Thus, to the extent that Passages' requested injunction seeks to bind Cliffside to take actions beyond removing the review of Passages Malibu from all Cliffside-owned sources, such an injunction is overbroad.

Second, the Court finds it reasonable and appropriate to ensure that the URL formerly associated with the Passages Malibu review on The Fix contains no substantive content and instead reflects a "404" error message to communicate unequivocally to visitors that The Fix does not maintain any review of Passages Malibu whatsoever. However, an important qualification is that nothing would preclude Cliffside from publishing *any* review of Passages' facility in the future. To the extent that Cliffside or The Fix wishes to issue a new review of Passages using the same URL that does not contain false or misleading advertising statements and does not otherwise violate the representations made in the Process Statement, Cliffside is free to do so. It is axiomatic that an injunction under the Lanham Act is impermissibly overbroad and raises First Amendment concerns if the injunction "prohibit[s] future comparative advertising even if it is truthful." *U-Haul Int'l, Inc. v. Jartran, Inc.*, 793 F.2d 1034, 1042 (9th Cir. 1986). Thus, any injunction issued by the Court will only bar Cliffside from making *false or deceptive* advertising statements about Passages' facility or treatment.

Lastly, the Court rejects Passages' request for an injunction pertaining to Cliffside's use of metadata key words. Any use of metadata was not a part of Passages' affirmative claims against Cliffside, and the jury made no factual findings as to Cliffside's liability under the Lanham Act for any use of metadata key words. Therefore, Passages' third proposed injunction exceeds the scope of this litigation and would be inequitable.

### D.        Monetary Relief

The Lanham Act provides that a successful plaintiff "shall be entitled . . . subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a). In this action, Passages seeks to recover both damages through Passages' lost profits and disgorgement of Cliffside's profits resulting from Cliffside's Lanham Act violations, as well as Passages' attorneys' fees incurred in litigating the instant action.

As more fully explained in the Court's Order regarding the parties' motions in limine and motions for summary judgment, the Court granted Cliffside's motion to exclude the testimony of Dr. Michael Williams, Passages' expert witness as to Passages' damages through lost profits. *See* Dkt. 432 at 17-19. Because Passages failed to offer any additional evidence in connection with Phase II of trial that would have been sufficient to create a triable issue as to whether Passages should be awarded damages, the Court determined that Phase II of trial was no longer necessary and dismissed the jury. Therefore, the Court will not address Passages' damages in this Order.

Furthermore, Cliffside argues in its trial brief that *Cliffside* is entitled to disgorgement of Passages' ill-gotten gains generated from Passages' unbranded website campaign, which was the subject of one of Cliffside's counterclaims. However, as previously noted, Cliffside did not present any evidence to the jury pertaining to its counterclaim regarding Passages' unbranded websites. Dkt. 432 at 14. Without any evidence presented on the subject, the Court did not include Cliffside's counterclaim regarding Passages' unbranded websites in the special verdict form submitted to the jury. Absent a jury finding as to Passages' liability for the use of unbranded websites, the Court will not consider Cliffside's counterclaim regarding the unbranded websites as part of the equitable relief analysis in this Order.

Accordingly, the only issues of equitable monetary relief to be resolved following Phase III of trial are (1) whether Passages is entitled to disgorgement of Cliffside's profits earned as a result of Cliffside's Lanham Act violations, and (2) whether Passages is entitled to an award of attorneys' fees incurred in this action.

### 1. *Disgorgement*

Applying the above standards to the instant case, the Court holds that Passages has met its burden to show by a preponderance of the evidence that Cliffside's Lanham Act violations regarding the Passages review were "willful." However, the Court holds that Passages has not met its burden to establish the amount of Cliffside's sales or profits that were attributable to Cliffside's Lanham Act violations.

Importantly, because the Court holds that Passages acted with unclean hands with respect to the Lanham Act claim about the Mission Statement and The Fix's purported journalistic

1  independence and lack of bias, it would be inequitable to award Passages any disgorgement for
2  such a violation; therefore, the Court's analysis focuses only on the aspects of Passages' claims
3  pertaining to the Passages review and the Process Statement.

4                                    i.    *Willfulness*

5          A plaintiff does not need to prove actual injury in order to recover the defendant's profits
6  from its Lanham Act violation. *Hansen Beverage Co. v. Vital Pharm., Inc.*, No. 08-CV-1545-
7  IEG (POR), 2010 WL 3069690, at *8 (S.D. Cal. Aug. 3, 2010) (citations omitted); *see also*
8  *Gracie v. Gracie*, 217 F.3d 1060, 1068 (9th Cir. 2000) (proof of actual injury not required to
9  obtain a recovery of lost profits). However, to obtain disgorgement of the defendant's ill-gotten
10  gains, a plaintiff *does* need to prove that the defendant's violation of the Lanham Act was
11  "willful." *See Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 439-42 (9th Cir.
12  2017) (finding that willfulness remains a prerequisite to an award of the defendant's profits
13  under the Lanham Act).

14          Willfulness "carries a connotation of deliberate intent to deceive" and can generally be
15  satisfied by conduct that is "deliberate, false, misleading, or fraudulent." *Fifty-Six Hope Road*
16  *Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1074 (9th Cir. 2015) (internal quotation marks
17  and citation omitted). Put another way, willfulness requires some showing of "a connection
18  between a defendant's awareness of its competitors and its actions at those competitors'
19  expense." *Id.* (internal quotation marks and citation omitted). A defendant's continued
20  dissemination of false or misleading advertising statements after being confronted by a
21  competitor does not establish willfulness if the defendant had a "genuine basis" to dispute a
22  competitor's claims. *See Pogrebnoy v. Russian Newspaper Distrib., Inc.*, 289 F. Supp. 3d 1061,
23  1072 (C.D. Cal. 2017). "Courts applying the willfulness requirement in false advertising cases
24  rely on authority imposing a willful infringement requirement in trademark infringement cases."
25  *Pipe Restoration Techs., LLC v. Coast Building & Plumbing, Inc.*, No. 8:13-cv-00499-JDE, 2018
26  WL 6012219, at *5 (C.D. Cal. Nov. 16, 2018) (citations omitted).

27          Based on the evidence set forth above, Passages has not met its burden to prove by
28  Cliffside willfully violated the Lanham Act with respect to the Passages review on The Fix.

As an initial matter, the fact that Cliffside did not author the original review of Passages Malibu, which was penned in 2011 by The Fix prior to Cliffside's purchase of The Fix, weighs against a finding that Cliffside deliberately intended to deceive visitors to The Fix as to the quality of Passages' treatment. It is true that Cliffside actively maintained the Passages review on The Fix after acquiring The Fix and affirmatively changed Passages' star rating in the review on several occasions, indicating that Cliffside deliberately intended to keep the Passages review on the website as a bona fide, factually-supported review. *See* Trial Exs. 2451, 2452, 2455 (showing that the overall review for Passages Malibu changed from 1 star to 2 stars to 2.5 stars between the date the review was first posted in 2011 and September 15, 2014).[11] But Cliffside's decision to maintain and alter the review on The Fix does not necessitate the conclusion that Cliffside did so with the intent to deceive; additional circumstantial evidence is required to reveal Cliffside's intent behind these actions.

To address another point, Cliffside points to the fact that Passages' overall rating increased with these changes in star ratings, Dkt. 405 at 16, but that is immaterial to the question of whether Cliffside deliberately published the Passages review with altered star ratings without an adequate factual basis to do so. Willfulness is not necessarily measured in terms of whether Cliffside deliberately intended to harm Passages by making changes to the Passages review that *further* disparaged Passages compared to the original review of Passages published in 2011. Instead, willfulness is measured in terms of whether Cliffside deliberately published a negative

---

[11] The Court acknowledges Cliffside's argument that California's "single-publication" rule designates the date that a review is first published as the time that a cause of action regarding the review accrues. *See Roberts*, 660 F.3d 1156, 1167 ("Information is generally considered 'published' within the meaning of the single-publication rule when it is first made available to the public."). Therefore, the failure to take down a publication after being made aware of the likelihood that statements in the publication are false does not amount to a republication that "restart[s] the limitations period" applicable to the cause of action. *Id.* However, the Ninth Circuit acknowledged the possibility that "alterations to a website might be so extensive as to constitute a republication of that webpage," without reaching the issue of what those circumstances might be. *Id.* at 1167 n. 7. Because the context of Cliffside's argument pertains to willfulness under the Lanham Act, *Roberts*' dicta is not directly applicable to this issue. Nevertheless, the Court is persuaded that changes to the star rating of Passages' review without conducting new client surveys constitute a "republication" of the Passages review, sufficient to overcome Cliffside's argument that Cliffside could not legally be willful in publishing a review it did not write. *See, e.g., Yeager*, 693 F.3d at 1082 (a statement is republished "when it is reprinted in something that is not part of the same 'single integrated publication,'" *i.e.*, "a statement made in a hardcover book is republished when it is repeated in a later paperback version of the book") (citations omitted).

review of Passages' facility without having a factual basis to support the statements made in the review, with the intent to cause harm to Passages' brand.

Nevertheless, based on the above, the record does not contain sufficient evidence that Cliffside intended for the Passages review article to harm Passages' brand. In responding to Passages' repeated requests for The Fix to take down the Passages review, Allison McCabe attempted to look for the original surveys conducted in connection with the Passages review, but McCabe could not find any evidence that those surveys existed. 2/19 PM Tr. at 73. The fact that McCabe actually performed a search for surveys supports the conclusion that The Fix did not simply maintain the Passages review without caring about whether surveys were actually conducted, weighing against a finding that Cliffside deliberately intended to publish false statements in connection with the Passages review. McCabe's failure to locate any surveys supporting the Passages review may undercut Cliffside's argument that the editorial staff of The Fix had subjectively believed that the Passages review was based on alumni surveys when Cliffside responded to Passages' demand letter requesting that the Passages review be taken down. *See* Dkt. 405 at 16 (citing 2/19 PM Tr. at 77; Dkt. 359 ¶¶ 10-11; 2/26 PM Tr. at 15). But just because McCabe could not find any written surveys, and refused Passages' demand to remove the review, does not mean that McCabe had actual knowledge that there were no surveys conducted at all. At most, McCabe's decision to maintain the Passages review on The Fix after failing to locate any written surveys amounts to negligence, perhaps even gross negligence, but does not rise to the level of deliberateness required to find that The Fix willfully committed a Lanham Act violation. The Court found McCabe not credible in terms of her testimony about Taite's involvement with The Fix, but the Court does find McCabe's testimony about her search for the surveys supporting the Passages review, and her subjective belief that the review was prepared with journalistic integrity even in the absence of written surveys on file, to be credible.[12]

---

[12]     Although the parties reference Justin Hewitt's testimony in their post-trial briefs, the Court finds that Hewitt's testimony during the Phase I trial about whether he actually conducted surveys of Passages alumni before writing the Passages review to be irrelevant. Hewitt was an editor with The Fix prior to Cliffside's acquisition of The Fix through C&S Media, so any intent or mental state on the part of Hewitt cannot be attributed to the

The most telling evidence of Cliffside's intent is an email from Taite in July 2017 reveals that Taite believed that Cliffside's competitors "are trained to simply talk shit about Cliffside and why Cliffside is a piece of shit why they are better," and Taite admitted that "I know this to be true, because before I had a commercial, I did the same thing, to promises and passages, that's how I filled Cliffside!" Tr. Ex. 952. This email amounts to an admission that Taite may have previously disparaged Passages in order to promote Cliffside, but the timeframe of Taite's actions is unknown based on this email alone. Taite's admission, while circumstantial evidence of Cliffside's mal-intent toward Passages generally, cannot be construed as an affirmative admission that Cliffside "did the same thing" regarding the Passages review on The Fix as well, particularly in light of the evidence from McCabe about her efforts to corroborate the factual underpinning for the Passages review. Passages also argues that other communications between Richard Taite and the editorial staff on The Fix suggest that Cliffside intended to maintain the Passages review on The Fix regardless of whether the Passages review was actually based on surveys of Passages' former clients, because Cliffside was using the Passages review in its pitches to prospective clients as a way to try to convince those clients to enroll with Cliffside instead. *See* Trial Ex. 305 (Taite suggesting to a prospective client that "I would do my due diligence and simply type in passages Malibu reviews into your Google bar and do the same with us and see how others view us both so that you are comfortable"). But Taite's purported use of the Passages review for marketing purposes is not the Lanham Act violation at issue, and neither does it provide any clarity as to Cliffside's knowledge of the existence of surveys from Passages or whether Cliffside intended to deceive potential clients through the Passages review.

As to the second aspect of Lanham Act violation regarding the Passages review—whether the review conformed to the explicit process set forth in the Process Statement—McCabe's failure to identify any written surveys in connection with the Passages review does establish that The Fix had actual knowledge that the Passages review did not conform to the

defendants in this action. And regardless, the jury's verdict in favor of Passages on Passages' Lanham Act claim necessarily means that the jury found Hewitt's testimony to be not credible. Therefore, the pertinent inquiry for Cliffside's intent is whether the relevant actors after Cliffside acquired The Fix had knowledge of the falsity of the

Process Statement. And McCabe acknowledged the possibility that the former editorial board, responsible for writing the initial Passages review, might not have used the same process as what was embodied in the Process Statement. *See* Trial Ex. 745. Nevertheless, the Process Statement does not affirmatively require that the surveys sent to former alumni of a treatment center be in "written" form; it would be sufficient, consistent with the Process Statement, that the survey questions were administered orally, as McCabe acknowledged prior editorial staff at The Fix may have done in connection with the older reviews in the Rehab Reviews section. And while Passages pleaded with The Fix that the Passages did not conform to the Process Statement, in that Passages was not given the opportunity to select the alumni who were interviewed in connection with the Passages review written in 2011, McCabe and the other editorial staff at The Fix was not required to accept Passages' allegation as true. And again, even if The Fix can be considered to have actual knowledge of the falsity of the Passages review in light of the Process Statement, there is an absence of evidence suggesting that Cliffside's refusal to take down the Passages review after Passages' repeated requests to do so was an action taken with the deliberate intent to harm Passages and deceive visitors to The Fix as to the nature of the Passages review. Based on the record established at trial, Passages has not satisfied its burden to show that Cliffside operated without a "genuine basis" to dispute Passages' requests for The Fix to remove the Passages review. *Pogrebnoy*, 289 F. Supp. 3d at 1072.

Lastly, although Cliffside even refused to take down the Passages review during the course of this litigation until after the jury rendered a verdict in favor of Passages, this fact does not amount to circumstantial evidence of Cliffside's intent regarding the Passages review. Contrasted to Passages' decision to add disclaimers to its unbranded websites after Cliffside filed its counterclaims against Passages, which the Court found irrelevant to unclean hands given the ample evidence in the record showing Passages' deliberate intent to create those websites for the purpose of deceiving the general public, here there was no such evidence of Cliffside's intent to use the Passages review in a similar manner. Thus, Cliffside's decision not to remove the

---

Passages review in light of the Process Statement and exhibited an intent to deceive potential visitors to the Passages review.

Passages review during the pendency of trial, without more evidence of Cliffside's intent, cannot establish that Cliffside willfully violated the Lanham Act.

Accordingly, the Court holds that Passages has not met its burden to show that Cliffside's violations of the Lanham Act regarding the Passages review were willful. Therefore, in the absence of a willful violation of the Lanham Act, disgorgement of Cliffside's profits is not an available remedy. *See Stone Creek*, 875 F.3d at 441.

ii.    *Causation*

Although the Court holds that Cliffside's Lanham Act violations were not willful, the Court finds it helpful to the parties to explain the Court's determinations on the amount of disgorgement that would be available to Passages in the event that the Court's findings on willfulness are reversed on appeal.

If willfulness is established, an award of the defendant's ill-gotten gains under an unjust enrichment theory as a result of a Lanham Act violation need only be based on "reasonable inferences and fair assessments of the evidence in the record." *Skydive Ariz., Inc. v. Quattrocchi*, 673 F.3d 1105, 1113 (9th Cir. 2012); *Intel Corp. v. Terabyte Int'l, Inc.*, 6 F.3d 614, 621 (9th Cir. 1993) (authorizing "crude" measures of determining monetary relief under the Lanham Act as long as the inferences or extrapolations relied upon by the trier of fact are not "inexorable" or "fanciful"). By statute, a plaintiff "shall only be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claim." 15 U.S.C. § 1117(a). However, an important requirement of an award of disgorgement is that the plaintiff must prove that the defendant's sales "are attributable to the infringing conduct." *Lindy Pen Co., Inc. v. Bic Pen Corp.*, 982 F.2d 1400, 1408 (9th Cir. 1993). In this regard, the plaintiff "has only the burden of establishing the defendant's gross profits from the infringing activity with reasonable certainty," which entitles the plaintiff to a presumption that those gross profits are the result of the infringing activity and shifts the burden to the defendant to prove otherwise. *Id.* (citations omitted).

Ultimately, a disgorgement award is limited to "the financial benefit [the defendant] received because of the advertising" constituting a Lanham Act violation. *U-Haul Int'l*, 793 F.2d

at 1042. This is because awards of the defendant's profits "shall constitute compensation and not a penalty." 15 U.S.C. § 1117(a).

Passages generally argues in favor of the application of a presumption of causation in this case, because Passages construes Cliffside's false advertising regarding the Passages review as "comparative" advertising. The Ninth Circuit has stated that awards of the defendant's profits may be "appropriate in false comparative advertising cases, where it's reasonable to presume that every dollar defendant makes has come directly out of plaintiff's pocket." *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 831 (9th Cir. 2011) (citations omitted). But the Court is not convinced that Passages' Lanham Act claims constitute claims of "comparative" advertising. Although it is true that Cliffside, Passages' competitor, published a false and misleading review of Passages on The Fix, the review itself did not juxtapose Passages' services against those of Cliffside to conclude that Cliffside's services are comparably better. The only evidence supporting any comparative nature of the Passages review is the presence of advertisements for Cliffside and hyperlinks to reviews of Cliffside's facilities elsewhere on the same page. Based on these facts, it is not reasonable to presume that every dollar Cliffside made from treating clients for addiction over the relevant time period came out of Passages' pocket, particularly because The Fix also reviewed other addiction treatment centers in its Rehab Reviews section aside from Passages and Cliffside. *See, e.g.*, Trial Exs. 1033, 2454, 2455 (showing links to reviews of other treatment centers in the margins of the Passages review); *see also Falcon Stainless, Inc. v. Rino Cos., Inc.*, No. SA CV 08-00926 AHS (MLGx), 2011 WL 13130703, at *15 (C.D. Cal. Oct. 21, 2011) (rejecting an award of disgorgement to one competitor cited in the defendant's comparative advertising because unlike advertising involving "a direct comparison between two competitors' products, [the defendant's] Flow-Rate Ad made comparisons to five other products").[13] Thus, in the absence of comparative advertising, "injury to plaintiff may be a small

---

[13] Passages argues that Passages and Cliffside are functionally the only two competitors in the local addiction treatment market, and therefore the presumption of comparative advertising should apply even though the Passages review does not specifically mention Cliffside by name. *See, e.g.*, *K&N Engr'g, Inc. v. Spectre Performance*, No. EDCV 09-01900-VAP (DTBx), 2012 WL 12893797, at *6 (C.D. Cal. Aug. 2, 2012) (noting that the presumption identified in TrafficSchool.com applies "[w]hen two competitors split a market, such that one's lost sales are likely the other's gains"). The only evidence cited for the notion that Passages and Cliffside are the dominant figures in the

45

1  fraction of the defendant's sales, profits, or advertising expenses." *TrafficSchool.com*, 653 F.3d

2  at 831 (internal quotation marks and citation omitted).

3      And even if the Court were to consider Passages' claim as one of comparative

4  advertising, the Court disagrees with Passages' characterization of the Ninth Circuit's statement

5  in *TrafficSchool.com* as relieving Passages of the obligation to establish some causal link

6  between the conduct underlying Cliffside's Lanham Act violations and Cliffside's profits for

7  which Passages seeks disgorgement. *See Lindy Pen*, 982 F.2d at 1408 (the plaintiff has the

8  "burden of establishing the defendant's gross profits *from the infringing activity* with reasonable

9  certainty") (emphasis added). Passages thematically argues throughout its briefs that the burden

10 was on Cliffside to prove that any profits earned during the relevant time period were attributable

11 to something other than Cliffside's Lanham Act violations. But *TrafficSchool.com* did not

12 proclaim to eliminate a plaintiff's burden to establish causation of damages entirely in the event

13 that the parties were direct competitors and the plaintiff's violative advertising was comparative.

14 In fact, the Ninth Circuit in TrafficSchool.com ultimately affirmed the district court's refusal to

15 award damages to the plaintiffs because the plaintiffs "didn't produce *any* proof of past injury or

16 causation, so the district court had no way to determine with any degree of certainty what award

17 would be compensatory." *TrafficSchool.com*, 653 F.3d at 831 (emphasis in original). Thus,

18 regardless of whether any presumption of causation applies, to the extent that Passages attempts

19 to characterize every cent earned by Cliffside as flowing from Cliffside's Lanham Act violations

20 without providing any factual connection between Cliffside's income and The Fix, then Passages

21 would not be entitled to disgorgement of Cliffside's profits.

22

23

---

24 local market is the testimony of Richard Taite, Cliffside's former CEO. *See* 2/21 PM Tr. at 40-41. The Court is not
   persuaded from Taite's testimony alone that any other addiction treatment centers are so inconsequential as to be
25 ignored for purposes of the competition between Passages and Cliffside for clients. In fact, the Court recalls that the
   parties repeatedly elicited testimony from witnesses during trial about Promises Malibu, a third treatment center in
26 Malibu which was prominently featured on The Fix and referred to by both parties in emails discussing their
   competitors. *See, e.g.*, 2/26 AM Tr. at 111 (Taite testifying at deposition that when Taite first opened Cliffside,
27 "Promises and Passages were the two big boys on the block"); Trial Ex. 952 (email from Taite stating "I know this
   to be true, because before I had a commercial, I did the same thing, to promises and passages, that's how I filled
28 Cliffside!"); 2/20 AM Tr. at 36-37 (Taite testifying at trial that Promises Malibu "would get mentioned on the gram"
   and that Promises was a "[b]ig name back then").

When assessing Passages' varying theories of calculating disgorgement to determine causation, and assuming that Passages had established that Cliffside's violations were willful, the Court holds that Passages has not met its burden to identify with any reasonable certainty what portion of Cliffside's profits are attributable to Cliffside's Lanham Act violations. The Court analyzes each of Passages' theories for calculating disgorgement below.

a.     Sharp Increase in Cliffside's Net Income

First, Passages points to the sharp increase in Cliffside's net income in 2014 as a reasonable estimation of the profits Cliffside earned from its improper activities on The Fix. *See* Trial Ex. 1125 (noting an increase of net income from about $400,000 in 2013 to over $4 million in 2014). Cliffside's net income continued to increase to around $5.5 million in 2015. *Id.* Passages argues that this increase in profits coincided with the start of Cliffside's advertising campaign on The Fix and increased page views of the Passages review. *Id.*

Passages' own characterization of the cause of Cliffside's increase in net income rebuts the conclusion that the entire amount of Cliffside's increase in net income was attributable to Cliffside's Lanham Act violations. At issue in Passages' claims for disgorgement is only the Passages review and the Process Statement posted on The Fix. Cliffside's advertising campaign on The Fix, even Cliffside's advertising on the webpage containing the review of Passages, was not a component of Passages' Lanham Act claims and was not part of the false and misleading advertising statements identified by the jury. Thus, it would be inappropriate for the Court to conclude that Cliffside's spike in net income is a reasonable approximation of Cliffside's earnings from its Lanham Act violations when Passages itself acknowledges that much of that increased income was derived from other advertising activity not violating the Lanham Act.

Aside from Passages' admission, there is no evidence even showing how much, if any, of Cliffside's net income was derived in any way from The Fix compared to other sources of acquiring clients. Cliffside, like Passages, advertises for its addiction treatment centers in other media, such as on television, and the evidence at trial shows that Cliffside generates almost all of its clients from sources other than The Fix. *See* 2/26 PM Tr. at 151-53. Even if it was appropriate to presume that all of Cliffside's profits derived from any activity relating to The Fix was

attributable to Cliffside's Lanham Act violations—which it is not—the Court cannot even identify what a reasonable estimation of that broader figure would be merely when referring to Cliffside's spike in profits in 2014. There are ample other reasons as to why Cliffside's profits increased at this time other than Cliffside's use of The Fix to advance its own treatment centers; the mere correlation between the visitors to the Passages review on The Fix and Cliffside's profits is insufficient to establish any causal link between the two figures, which is the reason the Court excluded the testimony of Dr. Williams, Passages' expert witness on damages. *See* Dkt. 432 at 17-19.

Because Passages has not identified with reasonable certainty the portion of Cliffside's increased net income attributable to Cliffside's Lanham Act violations through The Fix, Passages has not met its burden of proof to support a presumption of disgorgement under this theory. *See, e.g.*, *Rolex Watch, U.S.A., Inc. v. Michel Co.*, 179 F.3d 704, 712 (9th Cir. 1999) (affirming the district court's exercise of discretion to reject an award of disgorgement because "[i]t was [the plaintiff's] burden to show with reasonable certainty [the defendant's] gross sales from counterfeited altered 'Rolex' watches" and the plaintiff failed to satisfy its burden merely by pointing to the defendant's admission that 30% of the defendant's business "involved reconditioning used Rolex watches").

Accordingly, Passages' first theory of quantifying disgorgement of Cliffside's profits is insufficient to support a presumption based on reasonable certainty that all of Cliffside's increased net income beginning in 2013 is attributable to Cliffside's Lanham Act violations.[14]

b. Cliffside's Advertising Expenditures

Next, Passages relies on Cliffside's advertising expenditures on The Fix as an approximation of the value of The Fix to Cliffside. The evidence shows that Cliffside paid approximately $5 million to advertise Cliffside's treatment centers on The Fix from 2014 to 2018. *See* 2/20 AM Tr. at 7; Trial Ex. 1033; Dkt. 361 ¶ 7; Dkt. 361-2. This advertising campaign

---

[14] Because the Court rejects Passages' first theory of disgorgement on the merits, the Court declines to address Cliffside's argument that Passages' theory is procedurally improper because Passages failed to disclose such a theory prior to trial.

was independent of any actions taken by the editorial staff of The Fix regarding the review of Cliffside or the review of any other addiction treatment center.

Passages' second theory for approximating disgorgement with a reasonable certainty fails. As noted above, Cliffside's advertising campaign on The Fix is not the subject of Passages' Lanham Act claims for which disgorgement available, which pertain only to the Passages review and the Process Statement. Passages argues that the amount Cliffside was willing to pay to advertise on The Fix suggests that The Fix was worth at least $5 million to Cliffside given the benefits Cliffside reaped from the website. However, it would be inappropriate for the Court to fashion a presumption for purposes of disgorgement when viewing Cliffside's derived value from The Fix as a whole considering Cliffside's unchallenged advertising activity on The Fix. As Cliffside notes, the $5 million spent on advertising was across the entirety of The Fix's domain, and the advertising spend specifically in reference to the Passages review was an unknown fraction of that amount. But even assuming that there was a basis to isolate the amount Cliffside spent to place advertisements specifically on the Passages review page, Passages has not argued why any of Cliffside's advertisements on The Fix were false or misleading themselves. Any reasonable visitor to The Fix's website, including the Passages review, would understand that the banner advertisements for Cliffside's treatment center elsewhere on the page were exactly that— advertisements.

Passages' reliance on *U-Haul International* to support this theory of disgorgement is misplaced. There, the court affirmed the district court's presumption that the defendant's financial benefit from a false advertising campaign "was at least equal to the advertising expenditures" for that campaign. 793 F.2d at 1042. The advertising campaign at issue featured false statements that the defendant's trucks and associated equipment were safer, more stable, more fuel efficient, and/or better designed than the plaintiff's trucks. *Id.* at 1043. In light of this direct comparison between the parties' products, it made sense for the court to presume that the defendant received a financial benefit *from that same advertising campaign* at least equal to the costs of the campaign. *U-Haul International* does not stand for the principle that a court may presume that a defendant received a financial benefit from Lanham Act violations at least equal

to the cost of a wholly separate advertising campaign not at issue in the plaintiff's Lanham Act claims. And despite a temporal correlation between the inception of Cliffside's advertising on The Fix and Cliffside's sharp increase in net profits, Passages has not met its burden to establish with reasonable certainty that the two figures are causally related in any way. In fact, Cliffside's income continued to increase after 2015 even though the visitors to the Passages review on The Fix sharply declined at that time. *See* Trial Ex. 1125.

For these reasons, Passages' second theory for estimating Cliffside's profits from its violations of the Lanham Act is unpersuasive and insufficient to support a presumption that Cliffside benefited from its false advertising by at least $5 million.

c.     Cliffside's Advertising Savings

Lastly, Passages argues for a third mechanism to estimate Cliffside's financial benefit from its violations of the Lanham Act by pointing to the equivalent cost of Cliffside paying for advertising to reach the same number of consumers as there were visitors to The Fix's review of Passages. The Fix heavily relied on Passages' review to generate significant traffic for The Fix generally, and The Fix even informed Passages that three of the top 20 key word searches of The Fix were related to Passages. *See* Trial Exs. 111, 201. The Passages review on The Fix received 192,434 organic visits between 2014 and 2018. *See* Trial Exs. 1326-1691, 2749. Passages argues that, because Cliffside did not have to pay anything to generate those visits, Cliffside saved significant money from having to advertise separately to bring in those visitors.

To calculate Cliffside's estimated advertising savings, Passages relied on testimony from Arun Thach, Passages' search engine marketing manager. *See* Dkt. 369 ¶ 1. Thach testified at trial about "Google Adwords," an advertising platform hosted by Google that allows advertisers to bid a certain price for particular key words and make a link to the advertiser's product appear every time a person initiates a Google search using those key words. *Id.* ¶ 3. The advertiser then pays to Google the amount of money it bid every time a person clicks on the advertising link, an arrangement known as "pay-per-click." *Id.* Thach testified that, based on his extensive experience working with Google Adwords in connection with his employment by Passages since 2016, the average cost per click Passages paid for the key words "Passages Malibu" since March

2017 was $40.00 per click. *Id.* ¶¶ 5-6; Dkt. 369-1; 2/26 PM Tr. at 129-130, 136. In addition, Thach's documentary support shows that an average of 4,800 users per month entered Google searches containing the words "Passages Malibu" over that time period. Dkt. 369-1. Taite admitted during trial that Cliffside places bids on Google Adwords for key words related to Passages with the intent to have persons searching on Google for Passages instead click on the advertisements for Cliffside. 2/20 AM Tr. at 36-37. Thus, based on these figures, Thach testified that, if Cliffside was required to advertise for its own services by bidding on the key words "Passages Malibu" on Google Adwords instead of by using The Fix's review of Passages to steer potential clients away from Passages and to Cliffside, Cliffside would have had to pay $40.00 for each of the 192,434 organic visits to the Passages review, totaling $7,697,360. Dkt. 369 ¶ 8.

The Court finds Passages' argument unpersuasive. First and foremost, Passages' theory rests on the incorrect assumption that every visitor to The Fix's review of Passages constitutes a consumer of an affirmative advertisement for Cliffside Malibu. There is no evidence to suggest how many people who viewed the Passages review on The Fix would have clicked on an advertisement for Cliffside Malibu had the viewer instead searched for the key words "Passages Malibu" on Google, and any arguments on that front are purely speculative. As Cliffside correctly points out, Thach admitted that his calculation of Cliffside's saved advertising expenditures was irrespective of the content of the Passages review. *See* 2/26 PM Tr. at 127-29. To illustrate, had the Passages review been overtly positive without any false or misleading statements, Thach's calculation would still rely on the same assumption that Cliffside was benefitting from the Passages review the same as if a viewer had clicked on a link for a Cliffside advertisement. Such a result would be illogical, and Thach's testimony constitutes an acknowledgment that his calculation bears no causal relationship to Cliffside's Lanham Act violations at issue in this case. Thach also testified that he does not know what Cliffside's financial benefit would be per viewer of the Passages review page on The Fix. 2/26 PM Tr. at 139. Therefore, the record does not support the conclusion that Cliffside improperly financially benefitted from every viewer of the Passages review, let alone any viewer, in the manner that Passages suggests.

51

Second, the Court finds Thach's testimony about using the average cost per click for key word searches for "Passages Malibu" as a proxy for Cliffside's financial benefit not credible. Dr. Ward Hanson, Cliffside's expert rebuttal witness,[15] explained that bidding for search terms on Google Adwords is a "multi-item auction" in the sense that more than one advertising bid is accepted for any given key word. *See* 2/26 PM Tr. at 149. In other words, Google may allow for three separate advertisers to place an advertisement on the page showing search results for the key word "Passages Malibu." The significance of this bidding structure is that, while the top bidder is granted an advertisement at the top of the page, advertisers who bid less money may still receive an advertisement on the same page in a lower, and less visible, position on the page.

Dr. Hanson's own analysis of Google Adwords, conducted shortly before the Phase III bench trial, revealed that the range of bids for a "top tier" advertising placement for the key words "Passages Malibu" was between $7.99 and $35, and that a bidder may be able to receive a lesser advertising placement for "a couple of dollars." 2/26 PM Tr. at 149. Thus, the Court finds that Thach's estimate of $40.00 per click since March 2017 does not fairly reflect the average cost of Cliffside advertising on Google Adwords generally. Even if Thach's testimony was accurate, it does not logically follow that Cliffside would have to be positioned at the top of the bidding queue to receive the same theoretical advertising benefits as what Cliffside purportedly received through the review of Passages on The Fix. Moreover, the $40 per click figure Thach relies upon for his calculation is the amount Passages actually paid for that advertising, but that cost does not necessarily reflect the actual market rate for those clicks. *See* 2/26 PM Tr. at 135 ("That's how much Passages paid, $40 per click – that's how much we paid."). Just because Passages was subjectively willing to pay for an average of $40.00 per click to be placed at the top of the list of advertisements does not necessitate the conclusion that such a cost is a fair estimate of Cliffside's supposed advertising benefits from the Passages review.

---

[15]     As the Court previously explained, the Court allowed Dr. Hanson to testify to rebut Thach's opinion about Cliffside's advertising savings through Google Adwords, because Passages had not made such a theory of disgorgement known to Cliffside prior to trial. *See* Dkt. 432 at 20-22.

Furthermore, Dr. Hanson observed that Thach's testimony about the financial benefit of the Google Adwords advertisements to Cliffside was speculative. Dr. Hanson noted that for Cliffside Malibu to be able to benefit from such an advertising campaign on Google Adwords, Cliffside would have to pay at most $1.80 per click given the low conversion rate of people who viewed the Passages review page and subsequently called Cliffside Malibu seeking addiction treatment. 2/26 PM Tr. at 150-51. Thus, Dr. Hanson concluded that it would make no economic sense for Cliffside to spend $40.00 per click to advertise on the Google search results for searches containing the terms "Passages Malibu." *Id.* at 154-55. Based on Dr. Hanson's testimony, the Court finds that Thach's conclusions are speculative and do not constitute a reasonable estimation of Cliffside's financial benefit from its Lanham Act violations with respect to the Passages review through saved advertising expenditures.

d.      Equitable Adjustment for Inadequate Recovery

Although the Court found that Passages has not met its burden to identify the portion of Cliffside's profits unjustly earned from Cliffside's Lanham Act violations, the Lanham Act permits courts to enter recovery based on profits, if the amount of recovery otherwise would be excessive or inadequate, "for such sum as the court shall find to be just, according to the circumstances of the case." 15 U.S.C. § 1117(a). Any awards equitably adjusted by the court in this manner "shall constitute compensation and not a penalty." *Id.*

Here, the Court holds that Cliffside undoubtedly profited from its Lanham Act violations regarding the Passages review posted on The Fix in some manner. Despite the lack of evidence providing any reasonable estimate of what Cliffside's benefit might have been, Cliffside acknowledges in its trial briefing that there is a potentially reasonable calculation of Cliffside's ill-gotten gains. Specifically, Dr. Hanson testified that The Fix's average revenue from a visitor to The Fix was always below $0.30 per click from 2014 to 2018. *See* 2/26 PM Tr. at 150; Dkt. 365 at 3. Cliffside concedes that, given Dr. Hanson's estimate of The Fix's financial benefit of $0.30 per visitor to The Fix, when multiplying that figure by the 192,434 organic visitors to the Passages review between 2014 and 2018, "The Fix could not have benefitted more than $60,000." Dkt. 405 at 23 n. 19. Such an estimate makes sense in this context; had Cliffside not

violated the Lanham Act, the Passages review would not have been posted at all during that time period, so any visitors to that website were unjustly benefitting The Fix. And because Taite owned Cliffside and was the sole owner of C&S Media by 2016, see 2/20 AM Tr. at 13, it would be proper to attribute The Fix's unjust revenue to the Defendants in this case. Given the absence of any other evidence showing Cliffside's pecuniary gain from maintaining the Passages review on The Fix with reasonable certainty, such a measure of profits is appropriate in these circumstances. Therefore, the Court exercises its discretion under § 1117(a) to award Passages $60,000 in disgorgement of The Fix's profits.

### 2. *Attorneys' Fees*

In addition to an award of the defendant's profits, the Lanham Act also permits an award of attorneys' fees: "The court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). In an unrelated patent context, the Supreme Court has defined the term "exceptional case" as "simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014) (citing § 1117(a) as setting forth an "identical fee-shifting provision" as the one analyzed in that case). "District courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances." *Id.* The Supreme Court listed the relevant non-exhaustive factors appropriate for consideration under this analysis, including "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Id.* at 554 n. 6 (internal quotation marks omitted) (quoting *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 n. 19 (1994)); *see also SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*, 839 F.3d 1179, 1181 (9th Cir. 2016) (requiring application of the standards set forth in *Octane Fitness* for requests for attorneys' fees under the Lanham Act). The party seeking an award of attorneys' fees has the burden to prove entitlement to fees by a preponderance of the evidence. *SunEarth*, 839 F.3d at 1181 (citing *Octane Fitness*, 572 U.S. at 557-58).

1      The Court holds that this case does not rise to the level of an "exceptional" case

2 necessitating an award of attorneys' fees. Cliffside's defense throughout this case was not one of

3 frivolity, and none of Cliffside's legal arguments advanced during trial were objectively

4 unreasonable. There is no need to issue an award of attorneys' fees to deter Cliffside from

5 continuing to litigate aggressively in the future; Cliffside undoubtedly was motivated to pursue

6 this case to its conclusion based on Cliffside's subjective belief in the strength of its litigating

7 position, which was ultimately rejected by the jury.

8      Furthermore, as explained above, the Court holds that Cliffside's Lanham Act violations

9 were not "willful" for purposes of determining whether disgorgement is an available remedy.

10 Previously, the Ninth Circuit has held that, when assessing a request for attorneys' fees under the

11 Lanham Act, the court may consider the plaintiff's failure to recover damages but also "must

12 consider that plaintiffs obtained a judgment and an injunction that ameliorate a serious public

13 harm." *TrafficSchool.com*, 653 F.3d at 832. Furthermore, "the court must weigh the unlawfulness

14 of defendants' conduct," because "[i]t would be inequitable to force plaintiffs to bear the entire

15 cost of enjoining defendants' willful deception when the injunction [granted by the court]

16 confers substantial benefits on the public." *Id.* (citations omitted); *see also SunEarth*, 839 F.3d at

17 1180 (noting that the Ninth Circuit has previously required a plaintiff to show "malicious,

18 fraudulent, deliberate or willful" violations of the Lanham Act to be entitled to attorneys' fees)

19 (quoting *Lindy Pen*, 982 F.2d at 1409). It is unclear from *SunEarth* how a court should view the

20 willfulness of the defendant's conduct for purposes of a request for attorneys' fees, but it is clear

21 to the Court that such a consideration is appropriate under the "totality of the circumstances" test

22 set forth in *Octane Fitness*. *See* 572 U.S. at 554 n. 6 (an appropriate factor to consider under the

23 Fogerty test is the "objective unreasonableness" of the defendant's conduct underlying the

24 violation of the Lanham Act). Here, however, because there is no finding of willful deception,

25 the Court need not place the same emphasis on the injunctive relief obtained in this action as

26 *TrafficSchool.com* suggests.

27      Thus, considering the totality of the circumstances, the Court holds that Cliffside's

28 Lanham Act violations were not sufficiently objectively unreasonable as to merit an award of

55

attorneys' fees. Cliffside had a genuine basis to dispute Passages' previous requests for The Fix to remove the Passages review, based on Cliffside's subjective belief that the review was supported by surveys of former clients of Passages, even in the absence of written surveys on file. Cliffside's refusal to take the Passages review down was not a decision made with intent to deceive visitors to The Fix about the nature of the Passages review or the veracity of the Process Statement, and it does not mean that Cliffside published and/or republished the Passages review for the purpose of denigrating the Passages brand. Moreover, Passages' entitlement to injunctive relief simply removes the Passages review from the public domain, which does protect the public from the harms of Cliffside's false or misleading advertising. But the public's interest implicated in this case is less significant than a typical false advertising case; typically, advertisements are published to millions of consumers in media that consumers cannot avoid (*i.e.*, in public signs or during commercial breaks of entertainment programming), whereas here the offending review on The Fix could only be found through Internet searches or by deliberately clicking a link to the article. Thus, it is highly likely that very few visitors to the Passages review on The Fix were exposed to a false advertising statement against their will. This factor weighs against a finding that the injunctive relief obtained in this case inures to the public interest to a significant degree as to render the verdict in favor of Passages so exceptional as to warrant an award of attorneys' fees as well.

Furthermore, even assuming that the Court had found Cliffside's Lanham Act violations to be willful, the fact that Passages has not met its burden to establish its extent of injury by the Passages review on The Fix weighs against a finding that Passages maintained a substantively strong litigating position. Indeed, in this litigation Passages vigorously sought millions of dollars in damages and disgorgement for a single article reviewing Passages' addiction treatment at its facilities in a negative light, an article which the evidence shows was not so widely disseminated as to warrant damages on that magnitude. And the Court notes the numerous times that Passages materially misconstrued the Court's prior Orders or rulings to Passages' own benefit, causing disruption of the Court's anticipated procedures and confusion among both the Court and the parties. *See* 2/26 AM Tr. at 6-7 (the Court explaining that Passages' counsel unreasonably

misunderstood the Court's decision to dismiss the jury and cancel Phase II of trial in light of Passages' failure to identify sufficient facts to support a reasonable estimation of Passages' damages). Lastly, Passages' unclean hands in purchasing and disseminating numerous unbranded domains favorably discussing the Passages brand further supports the conclusion that Cliffside's Lanham Act violations were not "exceptional." The Ninth Circuit has expressed uncertainty as to whether equitable considerations such as unclean hands fit into the analysis of an exceptional case for attorneys' fees, see *TrafficSchool.com, Inc.*, 653 F.3d at 833 n. 9, but the Ninth Circuit's subsequent decision in *SunEarth* broadens the scope of the attorneys' fees analysis to allow for considerations of the "totality of the circumstances" and award attorneys' fees based on the court's "equitable discretion," see 839 F.3d at 1181. Therefore, Passages' decision to engage in substantially similar conduct as Cliffside did in terms of creating unbranded promotional websites, reinforces that Passages' position during this lengthy dispute with Cliffside has not always been objectively reasonable.

Lastly, nothing about Passages' defense of Cliffside's counterclaims was exceptional. Cliffside advanced a legitimate argument for how Passages violated the Lanham Act through promises of maintaining a "cure" for addiction, and the jury ultimately ruled against Cliffside after being presented with Cliffside's evidence as to the literal falsity of Passages' representations. Nothing in the record suggests that Cliffside's pursuit of its counterclaim was in bad faith, even if some of Cliffside's websites previously mentioned the word "cure" as part of Cliffside's promotion of its treatment services. *See* Trial Exs. 257-65.

For these reasons, the Court finds it inappropriate to require Cliffside to compensate Passages for its litigation position during this case. Exercising the Court's equitable discretion, when considering the totality of the circumstances, the Court holds that each party should bear its own expenses incurred during this excessively-protracted litigation. Accordingly, the Court denies Passages' request for an award of attorneys' fees.

# IV.     Conclusion

Based on the Court's findings of fact and conclusions of law set forth above, the Court makes the following rulings:

(1)     The Court enters judgment in favor of Passages on Passages' false advertising claim under the Lanham Act addressing the review of Passages Malibu on The Fix.

(2)     The Court holds that laches is inapplicable to Passages' Lanham Act claims.

(3)     The Court holds that Passages was guilty of unclean hands with respect to Passages' Lanham Act claim for false advertising premised upon The Fix's Mission Statement and representations of independence and lack of bias, and therefore the Court enters judgment in favor of Cliffside on that aspect of Passages' Lanham Act claim.

(4)     The Court holds that Passages has not met its burden to prove with reasonable certainty the amount of Cliffside's profits generated from Cliffside's Lanham Act violations, but the Court exercises its equitable discretion and awards Passages $60,000 as The Fix's estimated revenue generated from hosting the Passages Malibu review on its website.

(5)     The Court denies Passages' request for attorneys' fees.

(6)     The Court issues a permanent injunction as follows:

(a)     Cliffside is ordered to remove from all properties or Internet websites owned by Cliffside all versions of the review of Passages Malibu as found on The Fix since 2011; and

(b)     Cliffside is ordered to replace the prior URL associated with the Passages Malibu review on The Fix with a "404 error" message.

The Court declines to exercise supplemental jurisdiction over Passages' remaining, untried state law claims for libel per se, false advertising under Cal. Bus. & Prof. Code § 17500, and unfair competition under Cal. Bus. & Prof. Code § 17200. Accordingly, the Court remands Plaintiff's remaining state law claims to state court for further proceedings.

IT IS SO ORDERED.

Date:     July 1, 2019

HON. STEPHEN V. WILSON
UNITED STATES DISTRICT JUDGE

58